NICKELL, JUDGE:
Charles Castle appeals from denial of a motion to alter, amend or vacate entry of a domestic violence order ("DVO") restraining him from unauthorized contact with Robin Castle-his wife of eight years-and A.H. and O.H.,[1] her twin teenage daughters from a prior marriage. Charles alleges entry of the DVO, premised on a sexual *911 assault having occurred and the possibility of it recurring, was an abuse of the Rowan Circuit Court's discretion because there was no testimony he sexually assaulted Robin or A.H., and there was insufficient proof he sexually assaulted O.H. Following thorough review of the record, Charles' brief,[2] and the law, we reverse and direct entry of a new judgment.
FACTS AND PROCEDURAL BACKGROUND
On September 29, 2017, Robin petitioned the Rowan District Court for an emergency protective order ("EPO") for herself and her daughters. The petition was based on handwritten statements prepared by Robin and O.H. Robin wrote, Charles was "verbally and mentally abusive for eight years of our marriage (8 yrs.)," and, "on September 23rd he sexually harassed [O.H.], a minor under his care, while alone with her in the car." On a separate sheet, O.H. wrote,
[Charles] has sexually assualted [sic] me 3 times as of now. The most recent occuring [sic] on September 23, 2017. He would corner me in the car alone with him and ask me sexual questions, inapproperately [sic] grabbed my boob, and pressure [sic] me into showing him my boobs (I repeatedly told him no) and tried to tell me to not tell my mom or sister what happened while in the car.
On October 9, 2017, Charles petitioned the Rowan Circuit Court to dissolve the marriage. As a result, the EPO petition was passed from Rowan District Court to Rowan Circuit Court where Robin and O.H. testified on October 27, 2017.
O.H. was the first witness called during the hearing. She began her direct examination by describing the events of September 23, 2017-the day of the high school Homecoming dance:
O.H. I had to pick up my friend because we were going to do makeup that day together. And Charlie and me were in the car alone, and we had to take the long way around, and he asked me a lot of sexualized questions like, -- he'd always -- he'd ask, can I see your boobs or can I touch them or he asked me if I've had an orgasm or if I knew how -- if I knew what a -- if I knew what it was. He talked about my mom's sex life. He -- asked if I knew how to kiss, if I knew -- if I knew what a blow job was and --
Atty How did that make you feel, [O.H.]?
O.H. Scared. I didn't know what he was going to do. I was scared he'd pull over the car and do something to me. When I got to my friend's house, I went in her bathroom and cried for five minutes.
Atty What else occurred during the drive?
O.H. He just asked a lot of really uncomfortable questions. (CRYING) I'm sorry.
Atty Did he touch you or attempt to touch you?
O.H. I don't remember him attempting to touch me that time.
Atty Did that occur on another date and time?
O.H. Yeah.
*912 Atty Describe what occurred -- when -- what was the date, to the best of your knowledge, of that occurrence, and describe what happened?
O.H. To the best of my knowledge, it was about half a year ago. I -- I don't know if that was before or after my birthday. I could have been fifteen at the time. I don't know.
...
O.H. It happened six months ago, and I -- we were in the car alone again, and I might -- I was -- we were talking about the last trip I went with my mom to Lexington, and I brought up all the stores we went to and -- we went to Victoria's Secret -- we went -- that time that we went, and it got onto the topic, and he asked all these questions about what bra I was wearing, and he -- he asked he [sic] if he could feel like, the material, and he grabbed my boob. That's the time that he -- he touched me.
Atty How did that make you feel?
O.H. Really uncomfortable. I don't think I talked the rest of that drive.
Atty Did you confide in your mother or another person at that time?
O.H. I talked to my mom and my best friend, Catherine. I didn't tell anyone else.
...
Atty Did this occur on any other occasions?
O.H. Nothing to that level. No.
Atty What are some other occurrences regarding a sexual nature that have occurred between you and Mr. Castle?
O.H. I don't know if it would be referred as sexual, but like, when -- whenever his back was hurting or something, I -- I would help him with that or like, one time, when his thigh was hurting, I had ... to do that.... Whenever he had aches or something, I would help him with that.... That's the only time I can really think that it could be seen as something out of the ordinary.
Atty What are you asking this Court to do?
O.H. I just don't want him around me or my family.
Atty How do you feel about being in Mr. Castle's presence?
O.H. Uncomfortable. I don't want to be around him. I'm mad, mostly, but scared, too.
O.H. clarified she meant Charles "grabbed me inappropriately" when she used the term "sexually [assaulted]" in her statement in support of the EPO. O.H. testified three incidents involving Charles made her uncomfortable; she was asked about each incident separately.
The first incident described, but not the first chronologically-the uncomfortable conversation in the car-occurred midday on September 23, 2017, while Charles was driving her to a friend's apartment to prepare for the Homecoming dance. O.H.'s description of the awkward conversation ended without mention of anything else memorable occurring that day, but when asked about another line in her written statement-"pressured me into showing him my boobs"- she said that also happened on September 23, but did not say whether she complied with his request. In her written statement she said, "I repeatedly told him no." Despite the uncomfortable conversation, she went to the dance because "I didn't want to ruin my friend's night."
The second incident discussed-when Charles "grabbed my boob"-occurred in a car at night about six months earlier while returning from grocery shopping. Again, Charles was driving.
*913 The third incident described-which occurred a "few weeks" after Charles grabbed her-was when "he told me not to tell my mom what he -- like, what we talked about in the car[3] -- because he thought my mom overreacted." O.H.'s cross-examination concluded with the following exchange:
Q Are you alleging that Charlie physically injured you? You're not, are you?
O.H. No.
Q And so then, you're not alleging that he seriously physically injured you, are you?
O.H. No.
Q You're not alleging that he stalked you, are you?
O.H. That he what?
Q Stalked. Do you know what that means, [O.H.]?
O.H. No.
Q You're not alleging that, are you?
O.H. Yeah. I'm not.
Q Okay. And you're not alleging that you were afraid that he was going to immediately physically injure you? You're not alleging that, are you?
O.H. No.
She then voiced her real concern:
I was afraid that if we stayed in that house and my mom just let this go, that it would happen again, maybe not immediately, but again or it'd go further, and we would be stuck in that house. I was afraid that he would hurt me, maybe not immediately, but sometime in the future.
Robin testified next. When her attorney asked her to "explain to me what your daughter shared to you, and then what was [Charles'] response," opposing counsel objected on grounds of hearsay. Citing "the Jett doctrine,"[4] the trial court allowed Robin to repeat what O.H. had told her about the incident six months prior to the Homecoming dance in which O.H. alleged Charles had physical contact with her. Echoing her daughter's testimony, Robin said O.H. had alleged Charles "grabbed her boob." Robin went on to say she was "floored" by her daughter's accusation and confronted her husband about it. He claimed it was an accident and he "barely brushed her." Robin gave Charles "the benefit of the doubt," but thereafter "kept my eyes open and my ears open." On learning of the event, Robin did not contact police, nor did she seek an EPO. Robin was familiar with the process of obtaining an EPO because she had previously sought one against her own mother.
Robin then described the events of September 23, 2017. She picked up the twins and a classmate from the Homecoming dance. Robin drove to the classmate's home and A.H. escorted the friend to the door. While O.H. and Robin were alone in the car, a tearful O.H. described the uncomfortable conversation she had with Charles earlier that day. According to Robin-who did not witness the conversation-O.H. said Charles wanted to see and touch her boobs. He also spoke of kissing, orgasm, blow jobs and Robin's sex life. Robin testified she confronted Charles at home, he denied nothing, and "admitted to me that he did it[.]" Robin stated she went to bed first that night, leaving Charles in the living room, but he eventually came to the bedroom.
The next day, September 24, Charles and his nineteen-year-old son who also lives in the home, left for a collegiate golf tournament, returning two nights later, on *914 September 26. Robin, the twins, Charles and his son were all home the nights of September 26, 27 and 28. Between September 23 and 28, there were times Charles was alone in the house with the twins.
Around 6:00 p.m. on September 28, 2017, Robin and the twins left home and sought refuge with Robin's friend. The following day, Robin petitioned for the EPO on behalf of herself and the twins.
When testimony concluded, counsel for both parties argued the case. Thereafter, the trial court granted the DVO stating, "the definition under 403.720 Sexual Abuse,"[5] has been met. The court went on to say:
I think, clearly, I hear fear from both Ms. Castle and [O.H.] that something in the future could happen or that -- you know, whether there's fear that there would be retaliation for the stating of these events -- I understand that they're no longer in the home,[6] but this type of volatile situation, I think that tempers run rampant, and often, people lose control of their emotions, and, you know, the statements that were made with respect to the conversation that [O.H.] and Mr. Castle had lead me to believe that he received gratification from those statements or that discussion, and, you know, it's not normal for a father or a stepfather to touch the bra, the breast. That's not normal, and I cannot fathom any other reason why that would have occurred but for sexual gratification, and I believe that she's a credible witness. She appears very credible, so I'm going to grant the DVO and find that Mr. Castle shall not have contact with Robin Ann Castle, [A.H.], or [O.H.]. And I know that there has not been anything alleged with respect to abuse of Ms. Castle or [A.H.], but I think, given the nature of the situation, I think there is fear, and I think that they do have fear of physical injury as a result of possibly retaliation. So I'm going to grant the DVO[.]
Completing form AOC[7] -275.3, a DVO was entered on October 27, 2017. In relevant part, the trial court checked portions of the form stating:
ADDITIONAL FINDINGS:
? For the Petitioner against the Respondent in that it was established, by a preponderance of the evidence, that an act(s) of ... ? sexual assault[8] has occurred and may again occur[.]
(Footnote added.) The trial court only checked boxes on the form. It made no additional written findings.
Thereafter, Charles moved to alter, amend or vacate entry of the DVO under CR 52.02 and 59.05 citing an insufficiency of proof-specifically no testimony of sexual contact or sexual gratification occurring on September 23, 2017. The motion also suggested a civil restraining order separating *915 all parties would be more appropriate than the DVO entered by the trial court.
About a week later, Charles moved to supplement the motion to vacate, reiterating O.H. had specifically testified he did not attempt to touch her-inappropriately or otherwise-on September 23, 2017, and there was no proof he had physically injured or instilled imminent fear in anyone. Charles argued the EPO was not sought until six days after the alleged "uncomfortable" conversation between he and O.H., indicating a total lack of "imminent fear" as required by KRS 403.720. Finally, the motion noted the trial court had acknowledged from the bench there were no allegations as to Robin or A.H. but entered the DVO as to Robin and both twins out of an abundance of caution, leading Charles to request-at a minimum-the DVO be vacated as to Robin and A.H. Charles asked the trial court to make "written findings as to why a DVO has been entered" in the event it denied his motion to vacate. Attached to the motion was a transcript of the DVO hearing. A recording of the hearing is not part of the appellate record.
The motion to vacate was heard on November 16, 2017. From the bench, the trial court stated it had found O.H. to be a credible witness; it had heard testimony about a "touching"; it had found the touching occurred for Charles' sexual gratification; the term "sexual assault" is not defined in the statute; and, the AOC form should be improved because there is no checkbox for a stepchild. While prior findings were reiterated, only one new finding was made-the initial touching of O.H., followed six months later by an uncomfortable conversation-constituted a continuation of events. This appeal followed.
STANDARD OF REVIEW
A trial court is authorized to issue a DVO if it "finds by a preponderance of the evidence that domestic violence and abuse has occurred and may again occur[.]" KRS 403.740(1).
The preponderance of the evidence standard is satisfied when sufficient evidence establishes the alleged victim was more likely than not to have been a victim of domestic violence. Baird v. Baird , 234 S.W.3d 385, 387 (Ky. App. 2007). The definition of domestic violence and abuse, as expressed in KRS 403.720(1), includes "physical injury, serious physical injury, [stalking], sexual abuse, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, or assault between family members...." The standard of review for factual determinations is whether the family court's finding of domestic violence was clearly erroneous. CR 52.01 ; Reichle v. Reichle , 719 S.W.2d 442, 444 (Ky. 1986). Findings are not clearly erroneous if they are supported by substantial evidence. Moore v. Asente , 110 S.W.3d 336, 354 (Ky. 2003). "[I]n reviewing the decision of a trial court the test is not whether we would have decided it differently, but whether the findings of the trial judge were clearly erroneous or that he abused his discretion." Cherry v. Cherry , 634 S.W.2d 423, 425 (Ky. 1982) (citation omitted). Abuse of discretion occurs when a court's decision is unreasonable, unfair, arbitrary or capricious. Kuprion v. Fitzgerald , 888 S.W.2d 679, 684 (Ky. 1994) (citations omitted).
While "domestic violence statutes should be construed liberally in favor of protecting victims from domestic violence and preventing future acts of domestic violence[,]" Barnett v. Wiley , 103 S.W.3d 17, 19 (Ky. 2003), "the construction cannot be unreasonable." Id. (citing *916 Beckham v. Board of Education of Jefferson County , 873 S.W.2d 575, 577 (Ky. 1994) ). Furthermore, we give much deference to a decision by the family court, but we cannot countenance actions that are arbitrary, capricious or unreasonable. See Kuprion , 888 S.W.2d at 684.
Caudill v. Caudill , 318 S.W.3d 112, 114-15 (Ky. App. 2010) (footnote omitted).
LEGAL ANALYSIS
We will address the four errors alleged by Charles, but reverse entry of the DVO for reasons required by law rather than specifically argued by Charles on appeal. "When the facts reveal a fundamental basis for decision not presented by the parties, it is our duty to address the issue to avoid a misleading application of the law. This is such a case." Mitchell v. Hadl , 816 S.W.2d 183, 185 (Ky. 1991).
A trial court "speaks only through written orders entered upon the official record." Kindred Nursing Centers Ltd. Partnership v. Sloan , 329 S.W.3d 347, 349 (Ky. App. 2010). "[A]ny findings of fact and conclusions of law made orally by the circuit court at an evidentiary hearing cannot be considered by this Court on appeal unless specifically incorporated into a written and properly entered order." Id. There are no written findings in this case. Moreover, no findings made from the bench were incorporated into the standard form used to enter the DVO, nor the written order denying the motion to alter, amend or vacate the DVO. Hence, all the trial court's oral findings are beyond our consideration.
Thurman v. Thurman , 560 S.W.3d 884, 887 (Ky. App. 2018), specifies a "court must make written findings to support the issuance of the DVO." Thurman struck down a DVO consisting
entirely of the court's checking a single box on AOC Form 275.3 indicating it found [the respondent] had committed domestic violence[.] The court made no additional written findings, either on the form itself or the accompanying docket sheet. A ... court is obligated to make written findings of fact showing the rationale for its actions taken under KRS Chapter 403, including DVO cases, even if the rationale may be gleaned from the record. See, e.g., Keifer v. Keifer , 354 S.W.3d 123, 125-26 (Ky. 2011) ; Anderson v. Johnson , 350 S.W.3d 453, 458-59 (Ky. 2011).
Id. The DVO entered in this case is no better than the one struck down in Thurman.
Pettingill v. Pettingill , 480 S.W.3d 920, 925 (Ky. 2015), a more recent case, quotes CR 52.01,
[i]n all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specifically and state separately its conclusions of law thereon and render an appropriate judgment[.]
Pettingill goes on the say, "the judge [must] engage in at least a good faith effort at fact-finding and that the found facts be included in a written order." Id. (quoting Anderson , 350 S.W.3d at 458 ). In Pettingill , the trial court "listed on its docket sheet nine specific findings to support its order" which the respondent challenged as neither inaccurate nor unproved. As a result, the trial court in Pettingill was deemed to have carried out its fact-finding duty. Id. at 925. The same cannot be said in this case. The trial court made no written findings. Moreover, it could have corrected its error by making written findings in its order denying Charles' motion to alter, amend or vacate. Instead, it wrote only, "DENIED." "One should not have to ask a court to do its duty, particularly a mandatory one." Anderson , 350 S.W.3d at 458. Here, Charles asked the court for *917 written findings and was rebuffed. On the strength of Thurman , the DVO entered against Charles must be reversed and a new judgment entered consistent with this Opinion.
CHARLES' ALLEGATIONS
We turn now to the four errors alleged by Charles-abusing discretion by entering DVO; finding "sexual assault" had occurred and could recur despite no proof of such; admitting there was no proof of domestic violence as to Robin and A.H., but entering DVO as to Robin, A.H. and O.H.; and, misapplying the Jett Doctrine. We address all four claims.
As previously noted, the trial court used AOC-275.3 to enter the DVO. Many errors in this case stem directly from the trial court's lack of familiarity[9] with the form, or lack of attention to detail. We remind trial courts of the importance of "thoroughly and correctly complet[ing] all court orders." Hawkins v. Jones , 555 S.W.3d 459, 461 (Ky. App. 2018).
AOC-275.3 covers multiple situations. It applies to DVOs (and amended DVOs). It also applies to Interpersonal Protective Orders (IPOs) (and amended IPOs). As reflected on the form, it covers KRS Chapter 403, titled "Dissolution of Marriage; Child Custody[,]" which includes "domestic violence and abuse" and provides for issuance of a DVO. KRS 403.720(1) and (3). The form also covers KRS Chapter 456, titled "Civil Orders of Protection[,]" which addresses "dating violence and abuse[,]" stalking and sexual assault, and provides for issuance of an IPO. KRS 456.030(1). Distinctions in DVOs and IPOs, as well as in the terms "sexual abuse" and "sexual assault," are critical to our analysis.
DVOs have been around since 1992. KRS 403.740. A DVO may be sought by "a victim of domestic violence and abuse" or by an adult on behalf of a minor qualifying for such relief. KRS 403.725(1). IPOs are a relatively new addition, becoming effective in January 2016. KRS 456.030. A victim of "dating violence and abuse[,]" stalking, or sexual abuse, or an adult on behalf of a minor qualifying for such relief, may seek an IPO. KRS 456.030(1).
The legislature could have included IPOs-pertaining primarily to unrelated persons in a "dating relationship"-within KRS Chapter 403, but it did not. Instead, it created a new chapter. Being "presumed to be aware of existing laws when enacting a new statute[,]" Pearce v. University of Louisville, by and through its Board of Trustees , 448 S.W.3d 746, 760 (Ky. 2014) (citing St. Clair v. Commonwealth , 140 S.W.3d 510, 570 (Ky. 2004) ), the legislature could have enacted in the newly created chapter for IPOs the same rules and language applicable to domestic violence and abuse and DVOs. Again, it did not. It enacted language distinguishing IPOs from DVOs. See KRS 456.010(3).[10] In the context of this case, not all definitions pertaining to IPOs apply equally to DVOs.
Charles inaccurately argues the term "sexual assault" is not statutorily defined.[11]
*918 KRS 456.010(6) defines it as "conduct prohibited as any degree of rape, sodomy, or sexual abuse under KRS Chapter 510 or incest under KRS 530.020 [.]" A victim of sexual assault may apply for an IPO. KRS 456.030(1)(c). We have located no authority permitting a victim of sexual assault to apply for and receive a DVO. Therein lies a significant problem. In this case, the trial court specifically found-in the context of entering a DVO -Charles had committed an act of "sexual assault" and it could happen again. However, there was no proof rape, sodomy, sexual abuse or incest had occurred-and, would likely recur. At most, there was testimony Charles grabbed O.H.'s breast six months before an EPO was sought.
Contrary to the dissent, we hold there was not a preponderance of evidence to support entry of a DVO. First, we deem a "touching" of O.H.'s breast some six months earlier to be too tenuous to qualify as "sexual abuse" to support a DVO, especially when there was no proof-or even an attempt to establish-the touching occurred to sexually gratify O.H. or Charles. Moreover, Robin testified Charles had told her any touching was accidental. Robin testified she was "floored" when O.H. revealed the incident to her, but after confronting Charles about her daughter's claim, Robin gave Charles the benefit of the doubt and did not report the incident to police.
As the dissent notes, proving sexual gratification is difficult because only the rare defendant would ever admit it. Nevertheless, the legislature has defined "[s]exual contact" as "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying the sexual desire of either party[.]" KRS 510.010(7). To support entry of a DVO, the legislature requires a touching for sexual gratification to be proved by a "preponderance of the evidence[.]" KRS 403.740(1). We cannot ignore the legislature's mandate. There may well have been facts sufficient to establish sexual gratification, but they were not revealed to the trial court during the hearing. A trial court cannot simply "fathom" evidence-proof must be presented with an opportunity for cross-examination. To do otherwise creates a slippery slope fraught with danger and without end-not only for domestic violence cases but for all cases requiring a preponderance of evidence. An alleged touching, which is what we have here and which Charles told Robin was accidental-without proof of more-cannot support entry of a DVO based on sexual assault-especially when a DVO must be based on "domestic violence and abuse" which does not encompass "sexual assault."
The dissent compares this case to Edmondson v. Commonwealth , 526 S.W.3d 78, 87 (Ky. 2017), wherein the Supreme Court of Kentucky reversed and remanded for a new trial a criminal conviction for first-degree sexual abuse. Quoting Anastasi v. Commonwealth , 754 S.W.2d 860, 862 (Ky. 1988), the Court wrote in Edmondson , "[i]ntent can be inferred from the actions of an accused and the surrounding circumstances." Edmondson is factually distinguishable from the case at hand. First, it was a criminal jury trial-not the grant of a DVO. Second, the Supreme Court stated, "[i]ntent can be inferred[.]" We agree, but there must be proof from which to draw the inference. Third, all the alleged activity in Edmondson occurred on the same night, in the same location and with repetition. In this case, two events were separated by six months and only one had an alleged touching. In describing the night of the uncomfortable conversation which prompted Robin to petition for a DVO six days later, O.H. said there was no touching and no attempted touching.
*919 In deep contrast to our case, these are the facts of Edmondson : at a youth center, Edmondson offered an eleven-year-old girl $1.00 for each goal she scored. The child made four goals. After each goal, Edmondson paid her $1.00 and grabbed her buttocks. He then grabbed her buttocks a fifth time while saying good bye at the end of the night. A youth center video corroborated the child's claims. Edmondson is vastly differently from the facts presented in this case and does not support affirming entry of a DVO without a preponderance of evidence.
To satisfy the preponderance of the evidence standard, there must, in fact, be evidence. Here, there was no evidence of why or how Charles grabbed his stepdaughter's breast, nor that it progressed beyond an incidental touching, nor that it was repeated. Robin testified Charles told her he touched O.H. by accident and "barely brushed her." Charles did not testify and O.H. was not asked to provide details. We know a touching for the purpose of sexual gratification "does not include inadvertent or accidental touching of the intimate parts of another person." Bills v. Commonwealth , 851 S.W.2d 466, 471 (Ky. 1993). Perhaps if testimony had established "the manner of the touching" and "[u]nder what circumstances ... the touching [occurred,]" there would be proof to support a finding of sexual abuse-as opposed to sexual assault-and entry of a DVO. See Id. , 851 S.W.2d at 472 (citing People v. Graydon, 129 Misc.2d 265, 492 N.Y.S.2d 903, 904 (N.Y. Crim. Ct. 1985) ; People v. Morbelli , 144 Misc.2d 482, 544 N.Y.S.2d 442 (N.Y. Crim. Ct. 1989) ). Alas, there was not. At the end of the DVO hearing, all the trial court knew was six months before the Homecoming dance, Charles either "grabbed" or "barely brushed by" O.H.'s breast while he was driving home at night from a grocery shopping trip.
The trial court stated it could not "fathom any other reason" for the touching but sexual gratification. However, there is simply no evidence in the record from which to make a finding of sexual gratification. There being no proof of a touching for sexual gratification, there was no proof of sexual abuse-one means of committing sexual assault-and therefore, entry of a DVO based on that ground was clear error and an abuse of discretion.
Our result should in no way be construed as a comment on O.H.'s veracity or the verity of her words. O.H. could only respond to counsel's questions. Counsel failed to fully develop the child's testimony. This case should serve as a reminder to all attorneys to present a full and complete case to the trial court on which the desired relief may be granted.
The trial court's comment that Form 275.3[12] should be revised interests us. The comment stemmed from the trial court's insertion of a box on the form for "stepchildren." Had the trial court carefully read the form, she would have realized the information being requested in that portion of the form was Charles' "relationship to Petitioner" which was "spouse" and was correctly marked. Robin, Charles' wife, was the sole Petitioner-although she sought protection for both herself and her daughters. There was no need to create a box for "stepchildren"-the twins were not petitioning for relief in their names. Had the twins, or O.H. individually, been the petitioner(s), the box for "stepparent" (which appears to have been marked at *920 some point and whited out), would have been checked. The area on the form directly below identifying information about the Respondent appears as follows:
currently or previously in a dating relationship
none of the above relationships apply, but Respondent is alleged to have committed
stalking or ?sexual assault
To erase any potential confusion, this portion of the form applies to IPOs and KRS Chapter 456. It does not apply to DVOs and Chapter 403.
To put it bluntly, a DVO cannot be entered based on a finding of a sexual assault having occurred and the potential for it to recur as the trial court marked on the AOC-275.3 in two separate places. Never did the trial court base its written findings on proof of "domestic violence and abuse" which was the gist of its oral findings from the bench. The trial court stated the DVO was being granted because the definition of "sexual abuse" in KRS 403.720 had been met. As noted previously, KRS 403.720 does not define "sexual abuse." It does, however, define "[d]omestic violence and abuse[.]" KRS 403.720(1).
Before leaving this issue we comment on the lack of proof of sexual assault because Charles argues it in his brief. Being unaware "[s]exual assault" is defined in KRS 456.010(6), Charles "presumed" the trial court based its findings on "sexual abuse" as defined in KRS 510.110 through 510.130. While his presumption may have been accurate in light of comments the trial court made from the bench, the underlying premise is faulty. "[S]exual abuse" appears in the definition of "[s]exual assault[.]" KRS 456.010(6). However, there was no proof of sexual contact between Charles and O.H. during the car ride on September 23, 2017. O.H. specifically testified Charles did not touch or attempt to touch her that day and she feared only something might happen "sometime in the future." Whether analyzed under KRS 403.720(1), 403.740(1) or 456.010(6), there was no proof-and therefore, no preponderance of evidence-of sexual abuse having occurred and being likely to recur.
Charles' third allegation is there was no basis for entering a DVO on behalf of Robin and A.H. As previously stated, entry of a DVO is justified only on showing a preponderance of evidence of domestic violence and abuse. Even the trial court acknowledged no allegations were made as to Robin and A.H. Therefore, no grounds existed for entry of a DVO on their behalf.
Finally, the trial court misapplied the Jett Doctrine in allowing Robin, over hearsay objection, to repeat out-of-court statements O.H. had made to her. Before ruling, the trial court was given no indication O.H. had told Robin anything other than the substance of testimony O.H. had just stated from the witness stand. As it happened, Robin added nothing new or different to O.H.'s testimony. Robin merely repeated O.H.'s testimony which is the classic definition of hearsay. KRE[13] 801(c). The Jett Doctrine was inapplicable.
While this Court does not condone the alleged conduct of Charles, we hold the trial court committed clear error and abused its discretion in marking erroneous findings on a standard form, failing to make findings of fact required by both statute and court rule, and drawing legal conclusions unsupported by the record. We are compelled to REVERSE the trial court's decision and direct entry of a new judgment consistent with this Opinion.
TAYLOR, JUDGE, CONCURS.
JONES, JUDGE, DISSENTS AND FILES SEPARATE OPINION.

The girls, born March 17, 2001, are referenced by initials only to conceal their identity. They will reach the age of majority in 2019. A.H. did not testify or appear in this case.

Robin chose not to file a brief. When a brief is not filed, Kentucky Rules of Civil Procedure (CR) 76.12(8)(c) authorizes us to "(i) accept the appellant's statement of the facts and issues as correct; (ii) reverse the judgment if appellant's brief reasonably appears to sustain such action; or (iii) regard the appellee's failure as a confession of error and reverse the judgment without considering the merits of the case." Exercising our discretion, we elect not to impose a penalty.

The teen's written statement says, "[Charles] tried to tell me to not tell my mom or sister what happened while in the car."

Jett v. Commonwealth , 436 S.W.2d 788, 792 (Ky. 1969).

Kentucky Revised Statutes (KRS) 403.720 does not define the term "sexual abuse." KRS 403.720(1) defines the term "domestic violence and abuse" as "physical injury, serious physical injury, stalking, sexual abuse, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, or assault between family members or members of an unmarried couple[.]"

When the petition was heard, Robin had secured an apartment for herself and the twins and had vacated the home Charles owned when she and Charles wed. (Footnote added).

Administrative Office of the Courts.

From the bench, the trial court found "sexual abuse" had occurred, but on the form, checked the box finding "sexual assault" had occurred.

We could attribute the error to a newly revised form, but it had been in use nearly twenty-two months when entered in this case.

For purposes of a DVO, a "[f]oreign protective order" is defined as "any judgment, decree, or order of protection which is entitled to full faith and credit pursuant to 18 U.S.C. sec. 2265 that was issued on the basis of domestic violence and abuse[.]" KRS 403.720(3). For purposes of an IPO, however, a "[f]oreign protective order" is defined as "any judgment, decree, or order of protection which is entitled to full faith and credit pursuant to 18 U.S.C. sec. 2265 which was not issued on the basis of domestic violence and abuse[.]" KRS 456.010(3).

The trial court made the same mistake when denying the motion to vacate.

KRS 403.751(1) and KRS 456.110(1) require all forms pertaining to DVOs and IPOs to be created by AOC.

Kentucky Rules of Evidence.