RENDERED: JANUARY 8, 2021; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0265-ME

JOHNATHAN JONES  APPELLANT

v.  APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE LIBBY G. MESSER, JUDGE
ACTION NO. 19-D-00996-001

GLYNIS MARIA JONES  APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CLAYTON, CHIEF JUDGE; GOODWINE AND KRAMER, JUDGES.

GOODWINE, JUDGE: Johnathan Jones ("Johnathan") appeals the interpersonal protective order ("IPO") entered by the Fayette Circuit Court, Family Division, on January 21, 2020, and the findings of fact and conclusions of law entered on January 23, 2020. After careful review of the record, we affirm.

## BACKGROUND

Glynis Maria Jones ("Glynis") was married to Johnathan's brother who is now deceased. Glynis petitioned the family court for an IPO against Johnathan alleging he attempted to sexually assault her in her home on August 4, 2019. On August 7, 2019, the family court granted Glynis a temporary interpersonal protective order ("TIPO") and issued a summons for Johnathan to appear at a hearing on the petition.

After multiple continuances, the family court heard the case on January 21, 2020. At the hearing, Glynis testified she and Johnathan had not seen or spoken to one another for several years prior to her husband's death in 2019. After the funeral, they checked in with each other regularly because of their mutual grief. Johnathan visited Glynis' home on more than one occasion. During one of his visits to her home, he brought a gun, and Glynis requested he not bring it back to her home.[1] Johnathan also gave Glynis four hundred dollars for her husband's funeral, which she understood to be a gift.

During her testimony, Glynis introduced a series of text messages into the record. On the evening of August 3, 2019, Johnathan initiated the following exchange:

---

[1] Johnathan's testimony indicated he had a license to carry the gun.

Johnathan: "Hey I'm looking for some company!! Yes I'm drinking"

Glynis: "NO THANKS IM GETTING MY HAIR DONE."

Johnathan: "Will you come to me at own"

Johnathan: "afterwords"

Johnathan: "I was there for you"

Glynis: "THANK YOU FOR BEING THERE FOR ME IM GETTING MY HAIR DONE FOR CHURCH TOMORROW AND FOR MY SON AND NEPHEWS MEMORIAL CELEBRATION MONDAY LOVE YOU."

Johnathan: "Ok I will be at your house tomorrow"

Johnathan: "Love you sis"

Johnathan: "Bty ima fuck you"

Glynis: "WHAT ARE YOU GOING THROUGH? NO WAY."

Johnathan: "Yes"

Petitioner's Exhibit 1.

The following day, Johnathan sent Glynis a text message stating, "I'm on my way[.]" *Id.* Soon thereafter, Johnathan arrived at Glynis' home, and she allowed him inside. Upon entering her home, Johnathan removed his gun from its holster and placed it on a stool. He then demanded Glynis repay him the money he lent her for her husband's funeral. Glynis told him she could not repay the money

-3-

and questioned whether he sent the message containing sexual content to her by mistake. Johnathan stated he knew who he was texting and had previously been sexually aroused when hugging her. He told Glynis she was going to have sexual intercourse with him to pay off her debt or he would "do it for her."

Glynis testified she was frightened by Johnathan's conduct. She ran to her bedroom to retrieve her cellphone to call the police. Johnathan followed her, grabbed her as she was leaving the room, held her in a "bear hug," and attempted to pull her back into the bedroom. He held her with the front of his body pressed against her back and his arms pressing against the undersides of her breasts. Glynis held onto the doorframe to keep Johnathan from pulling her into the room and repeatedly told Johnathan, "No." He responded, "Yes." She eventually broke free and ran outside. She then reported the incident to the police.

Glynis testified, after her initial surprise at Johnathan's text message, she was frightened by his actions on August 4, 2019. She testified to feeling traumatized. She no longer felt comfortable sitting on her porch or being outside after dark. She installed additional locks on her doors.

James Jennings, Glynis' friend, then testified to being present when she received the text message containing sexual content from Johnathan. He observed the message upset and scared her. Since the incident, James testified Glynis appeared worried about her doors being locked.

-4-

At the close of Glynis' case, Johnathan moved for a directed verdict, arguing the facts to which Glynis testified, if believed, did not meet the statutory criteria for issuance of an IPO. The family court denied Johnathan's motion.

Johnathan then testified, characterizing Glynis' testimony as a near-complete fabrication. He admitted to sending Glynis the text messages on August 3, 2019, but he claimed the message containing sexual content was intended for his acquaintance, Candice Walker, not Glynis. Johnathan testified to frequently engaging in sexually explicit conversations with Ms. Walker. He stated he did not recognize his mistake even when Glynis responded to the message. At no point did Johnathan acknowledge his mistake at the time or apologize to Glynis.

Johnathan admitted to going to Glynis' home on August 4, 2019, but he denied committing any of the acts to which she testified. Instead, he alleged he visited her to tell her he could not give her money. Johnathan claimed, after asking for the four hundred dollars for her husband's funeral, Glynis made two additional requests for money. Johnathan testified to giving her forty dollars upon her second request but refusing her third request. His unprompted visit to her home on August 4, 2019, was to reiterate his refusal to give her funds. He alleged Glynis filed her petition as retaliation for his refusal to give her additional funds. He further defended himself against the allegations by claiming he was not physically attracted to Glynis.

Candice Walker then testified on Johnathan's behalf. She met Johnathan through work and occasionally engaged in sexually explicit conversations via text messages with him. She testified to receiving messages from him on August 3, 2019, and August 4, 2019, but could not recall the contents of the messages or when, during the two days, she received them. She stated they were likely sexual in nature. Neither Ms. Walker nor Johnathan produced any text messages from those or any other dates to support these claims.

At the close of evidence, Johnathan renewed his motion for a directed verdict, which the family court denied. The court entered an IPO on Glynis' behalf. The court found Glynis' testimony to be "significantly more credible" than Johnathan's testimony. Record ("R") at 35. The family court found Johnathan's actions constituted a "clear attempt at a sexual assault." *Id.* at 36. The court elaborated as follows:

> [T]he criminal attempt of any of the offenses enumerated in KRS[2] 510 meets the statutory requirement of KRS 456.060 for entry of an [IPO]. Inchoate offenses are, by their nature, included in the statutory offenses themselves. It cannot have been the legislative intent that a victim of sexual violence, who manages to escape her attacker, is denied the ongoing protections of an IPO merely due to her good fortune to have fought off and escaped her attacker. Therefore, the [c]ourt finds that the sexual assault does not need to be completed for the victim to be placed in reasonable fear of sexual contact or the fear of a future sexual assault.

[2] Kentucky Revised Statutes.

-6-

*Id.* at 37.

The family court additionally found Johnathan committed sexual abuse in the third degree.[3] The court found Johnathan "grabbed [Glynis] aggressively around her body and pressed his body to hers[,]" and this touching was intended for Johnathan's sexual gratification. *Id.* Finally, the family court found Johnathan stalked Glynis.

> The multiple contacts over the span of two days that were rejected and, given the nature of the communications, his showing up at her home again requesting sexual contact constitute a course of conduct that seriously alarmed [Glynis], which served no legitimate purpose and would have caused any reasonable person to suffer the same substantial distress.

*Id.* This appeal followed.

## STANDARD OF REVIEW

A court may enter an IPO if it finds "by a preponderance of the evidence that dating violence and abuse, sexual assault, or stalking has occurred and may again occur[.]" KRS 456.060(1). The preponderance of the evidence standard is met when "sufficient evidence establishes the alleged victim was more likely than not to have been a victim" of dating violence and abuse, sexual assault, or stalking. *Dunn v. Thacker*, 546 S.W.3d 576, 580 (Ky. App. 2018) (citing *Baird*

---

[3] KRS 510.130, a Class B misdemeanor.

*v. Baird*, 234 S.W.3d 385, 387 (Ky. App. 2007) (applying the preponderance of the evidence standard in the context of issuance of a domestic violence order ("DVO")).

"A [family] court's findings of fact will only be disturbed if clearly erroneous." *Halloway v. Simmons*, 532 S.W.3d 158, 161 (Ky. App. 2017) (citations omitted). Factual determinations are not clearly erroneous if they are "supported by substantial evidence." *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003) (citation omitted). The test is not whether this Court would have decided a case differently but whether the family court's decision was "unreasonable, unfair, arbitrary or capricious." *Caudill v. Caudill*, 318 S.W.3d 112, 115 (Ky. App. 2010) (citation omitted).

Furthermore, "[s]tatutory interpretation is a question of law and this Court reviews it *de novo*." *Artrip v. Noe*, 311 S.W.3d 229, 231 (Ky. 2010) (citation omitted).

## ANALYSIS

Johnathan raises four arguments on appeal: (1) the family court improperly interpreted KRS 456.010(6) to include attempted sexual assault and abused its discretion in finding an attempted sexual assault occurred and may again occur; (2) the court abused its discretion in finding stalking occurred and may again occur; (3) the court abused its discretion in finding Johnathan committed

sexual abuse in the third degree; and (4) the court erred in denying his motions for directed verdict.

First, KRS 456.010(6) defines sexual assault as "conduct prohibited as any degree of rape, sodomy, or sexual abuse under KRS Chapter 510 or incest under KRS 530.020[.]" Johnathan argues the statute unambiguously does not include attempted offenses in the definition of sexual assault. He compares this to the definition of "[d]ating violence and abuse," which includes "physical injury, serious physical injury, stalking, sexual assault, strangulation, or **the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault** occurring between persons who are or have been in a dating relationship[.]" KRS 456.010(2) (emphasis added). Without citing any case law in support of his argument, Johnathan claims that to read attempt or the "infliction of fear" language contained in KRS 456.010(2) into KRS 456.010(6) would ignore the plain meaning of the statute and the intent of the General Assembly. We disagree.

Although the language of KRS 456.010(6) alone may appear unambiguous, we are required to consider not only the singular subsection but the entire statutory scheme for IPOs. *See Schoenbachler v. Minyard*, 110 S.W.3d 776, 783 (Ky. 2003). "[O]ur duty is to ascertain and give effect to the intent of the legislature." *Marshall v. Marshall*, 559 S.W.3d 381, 384 (Ky. App. 2018) (internal

quotation marks and citation omitted). Statutes "shall be liberally construed with a view to promote their objects and carry out the intent of the legislature[.]" *Schoenbachler*, 110 S.W.3d at 783 (citing KRS 446.080(1)). No provision should be interpreted to bring about an "absurd or unreasonable result." *Id*. (citation omitted).

To read KRS 456.010(6) to exclude attempted sexual assault would run counter to the legislative intent of KRS Chapter 456. The General Assembly enacted the IPO statutes to "[a]llow victims to obtain effective, short-term protection against further wrongful conduct in order that their lives may be as secure and as uninterrupted as possible[.]" KRS 456.020(1)(a). Furthermore, these statutes "should be construed liberally in favor of protecting victims from domestic violence and preventing future acts of domestic violence." *Barnett v. Wiley*, 103 S.W.3d 17, 19 (Ky. 2003) (citation omitted).[4] To provide someone who is placed in fear of imminent sexual abuse the protection of an IPO simply because he or she is or has been in a dating relationship with his or her attacker but to bar protection for someone who has an identical experience but is not in a romantic relationship with his or her attacker would defy both common sense and the intent of the legislature. Such a result would surely be absurd.

---

[4] *Barnett* pertains to issuance of a DVO rather than an IPO. Although the statutes governing the issuance of DVOs are found under KRS Chapter 403, the legislative intent for enacting the IPO statutes is identical to that of the DVO statutes. *See* KRS 403.715(1).

Relatedly, Johnathan argues, if attempted sexual assault is a qualifying act for issuance of an IPO, insufficient evidence exists in the record to support the finding that such an attempt occurred in this case. He argues Glynis' testimony was unconvincing, and the family court ignored his allegation that Glynis repeatedly asked him for money.

The family court, not the appellate court, is the trier of fact and, as such, is responsible for judging the credibility of witnesses.

> Regardless of conflicting evidence, the weight of the evidence, or the fact that the reviewing court would have reached a contrary finding, due regard shall be given to the opportunity of the [family] court to judge the credibility of the witnesses because judging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the [family] court.

*Moore*, 110 S.W.3d at 354 (internal quotation marks and citations omitted). The family court was convinced by Glynis' testimony while it found Johnathan's testimony "completely bereft of credibility." R. at 36.

According to Glynis' testimony, Johnathan sent her multiple text messages requesting to see her, including one with sexual content. Glynis clearly denied his advance. Johnathan then went to her home uninvited and carrying a gun. He told her if she did not have sexual intercourse with him, he would "do it for her." When she attempted to get away from him and call the police, he grabbed her. Despite her repeated refusal, he attempted to pull her into the bedroom. But

-11-

for Glynis holding onto the doorframe and eventually escaping out of the house, Johnathan's intent to sexually assault her would have materialized. We have no basis to disturb the family court's findings that Johnathan attempted to sexually assault Glynis and placed her in fear that such an assault was imminent.

Next, Johnathan argues the family court abused its discretion by finding he stalked Glynis.

(1) A person is guilty of stalking in the second degree when he intentionally:

(a) Stalks another person; and

(b) Makes an explicit or implicit threat with the intent to place that person in reasonable fear of:

1. Sexual contact as defined in KRS 510.010;

2. Physical injury; or

3. Death.

KRS 508.150(1).

(a) To "stalk" means to engage in an intentional course of conduct:

1. Directed at a specific person or persons;

2. Which seriously alarms, annoys, intimidates, or harasses the person or persons; and

3. Which serves no legitimate purpose.

(b) The course of conduct shall be that which would cause a reasonable person to suffer substantial mental

distress.

KRS 508.130(1). "Course of conduct" is defined as

> a pattern of conduct composed of two (2) or more acts, evidencing a continuity of purpose. One (1) or more of these acts may include the use of any equipment, instrument, machine, or other device by which communication or information is transmitted, including computers, the Internet or other electronic network, cameras or other recording devices, telephones or other personal communications devices, scanners or other copying devices, and any device that enables the use of a transmitting device.

KRS 508.130(2).

Johnathan first argues his actions did not constitute the requisite "course of conduct." The record indicates, at a minimum, Johnathan repeatedly sent Glynis text messages, including one stating he was going to engage in sexual intercourse with her, which she refused; went to her home uninvited and armed; told her he would "do it for her" if she did not have sexual intercourse with him; made additional comments of a sexual nature; and then grabbed her and attempted to pull her into a bedroom. Although these acts occurred over the relatively short period of two days, a specific length of time is not required by statute. Instead, KRS 508.130(2) requires only that at least two acts be committed to show "a continuity of purpose." Here, Johnathan clearly committed at least two acts and his purpose to engage in sexual contact with Glynis, regardless of her unwillingness to participate, was clear from his conduct.

-13-

Johnathan next argues Glynis was not seriously alarmed, intimidated, or harassed by his actions. He alleges Glynis was only surprised upon receipt of his text message. However, the record shows she was also upset and frightened by it. Furthermore, she unequivocally testified to being frightened when Johnathan showed up at her home demanding she either repay money she owed him or have sexual intercourse with him. Glynis repeatedly refused his request and ran from him. Thereafter, she called the police. Undoubtedly, this meets the standard under KRS 508.130(1)(a). There was also no legitimate purpose for Johnathan's conduct.

Furthermore, Johnathan's conduct was explicitly threatening. KRS 508.150(1)(b). He repeatedly threatened sexual contact and, despite her refusal, attempted to act upon his threats. Undoubtedly, this conduct would put a reasonable person in fear of sexual contact, as well as cause a reasonable person substantial mental distress. On this basis, the family court did not abuse its discretion in finding stalking had occurred.

Third, Johnathan contends the family court erred in finding the "bear hug" established sexual abuse in the third degree because his touching of Glynis was not for his sexual gratification. "A person is guilty of sexual abuse in the third degree when he or she subjects another person to sexual contact without the latter's consent." KRS 510.130(1). Sexual contact is defined as "any touching of the

-14-

sexual or other intimate parts of a person done for the purpose of gratifying the sexual desire of either party." KRS 510.010(7).

Johnathan relies upon *Castle v. Castle*, 567 S.W.3d 908 (Ky. App. 2019), in support of his argument. Therein, this Court held the record did not support a finding of sexual abuse where a stepfather either "grabbed or barely brushed by" his stepdaughter's breast because there was no evidence the act was for his sexual gratification. *Id.* at 919 (internal quotation marks omitted). However, the *Castle* Court also held testimony establishing "the manner of the touching and under what circumstances . . . the touching occurred" could be sufficient proof of sexual abuse. *Id.* at 919 (internal quotation marks and brackets omitted). Additionally, although the majority in *Castle* found a lapse of six months since the touching "too tenuous" to support a finding of sexual abuse, *id.* at 918, the dissenting opinion was unconvinced such a gap in time was determinative. *Id.* at 921-22 (Jones, J., dissenting).

Herein, unlike in *Castle*, Johnathan does not claim his touching of Glynis was inadvertent. Glynis' testimony was the only credible evidence presented regarding the manner of touching and surrounding circumstances. Johnathan aggressively grabbed her in a "bear hug," pressing the front of his body against her back with his arms pressing against the undersides of her breasts. He then attempted to drag her into the bedroom against her will. Directly before

grabbing Glynis, Johnathan told her he was sexually aroused by hugging her on a prior occasion and he would "do it for her" if she did not have sexual intercourse with him. Furthermore, unlike the six-month lapse *Castle*, the entire incident, including Johnathan's earlier text messages, occurred over a period of less than twenty-four hours.

Johnathan's manner of touching, his prior words and actions, as well as the timeframe in which the incident occurred support the family court's finding that the "bear hug" was for Johnathan's sexual gratification and, as such, qualified as sexual contact to which Glynis did not consent. On this basis, the family court did not abuse its discretion in finding by a preponderance of the evidence Johnathan committed sexual abuse in the third degree.

Regarding the family court's findings of attempted sexual assault, stalking, and sexual abuse in the third degree, Johnathan argues there was insufficient evidence to find the acts may again occur without issuance of the IPO, as required by KRS 456.060(1). To support this argument, Johnathan asserts the parties went years without seeing or speaking to one another prior to Glynis' husband's death and, prior to the incident in question, he did not attempt to have sexual contact with Glynis. While this may be true, it is not determinative. The parties live in the same city, and Johnathan knows were Glynis' home is located. Johnathan went to Glynis' home uninvited on August 4, 2019. Glynis testified to

feeling unsafe because of Johnathan's conduct. Based upon the record, the family court did not err in finding the acts may again occur without issuance of the IPO.

Finally, Jonathan alleges the family court erred in denying his motions for a directed verdict. As raised by Glynis, a directed verdict is improper in a bench trial, and Johnathan should have, instead, moved for involuntary dismissal under CR[5] 41.02(2). *Brown v. Shelton*, 156 S.W.3d 319, 320 (Ky. App. 2004). Even under CR 41.02(2), the family court did not abuse its discretion in denying Johnathan's motions. The court found Glynis' testimony credible, and evidence was sufficient to survive Johnathan's motions.

## CONCLUSION

Accordingly, the IPO entered by the Fayette Circuit Court, Family Division is affirmed.

ALL CONCUR.

BRIEF FOR APPELLANT:        BRIEF FOR APPELLEE:

Jason Rapp                  Dorislee Gilbert
Lexington, Kentucky         Louisville, Kentucky

---

[5] Kentucky Rules of Civil Procedure.