RENDERED:  MARCH 21, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0455-ME

CHRISTOPHER ANDREW CLAN                                                          APPELLANT


v.                    APPEAL FROM HARDIN FAMILY COURT
                      HONORABLE M. BRENT HALL, JUDGE
                      ACTION NO. 23-D-00668-001


HOPE MARIE STREBLE                                                               APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  A. JONES, KAREM, AND TAYLOR, JUDGES.

TAYLOR, JUDGE:  Appellant, Christopher Andrew Clan (Clan), appeals from an

order of protection entered against him on March 4, 2024, by the Hardin Family

Court.[1]  After careful review of the briefs and the law, we affirm.

---

[1] Whether the order of protection entered was an Interpersonal Protective Order or a Domestic Violence Order is an issue on appeal.

# BACKGROUND

Clan and Appellee, Hope Streble (Streble), worked together at Silverleaf Sexual Trauma Recovery Services (Silverleaf ) and began dating and attending church together in the Spring of 2023. The relationship ended in early August of 2023. The last time the parties had contact was via text message in September of 2023. (Video Record (V.R.), March 4, 2024, Hearing – 10:57:15.) On November 21, 2023, Streble filed a Petition for Order of Protection in the Hardin Family Court. The allegations contained therein read in pertinent part as follows:

> On the evening of May 18, 2023, I was at Chris' house. We had been watching a movie when he said he was tired and wanted to lay down. Shortly after we paused the movie and laid down in his room, he started kissing me. Then, he un-fastened my bra and started touching my breasts. Then, he put his hand in my underwear and put his fingers in my vagina. I kept pulling back to speak and stop the kissing, and told him to stop and that it was hurting me. After a minute or so, then he stopped. At the time, we were dating. We had talked about boundaries before, and I told him that I was NOT ok with anything more than kissing. I was very scared and told him to stop. When he did shortly after that, he told me he would not do it again. When I went into work the next morning he left a necklace and a note saying how precious I was to him and in text he said he would never do it again. However, by the following week he did it again. These actions occurred at least 1-2 times a week until I broke up with him in August for continually breaking my boundaries. It got to where my body would shake and I would shiver all over when he'd do this and I would break out in tears yelling for him to stop and that it

wasn't right for him to do. He would never ask beforehand if it was ok, he would just start doing it. I would tell him that it was not right, to stop, and I did not want to do that, but he said I should be ok with it because it, "wasn't really sex" and that I should be ok with it because it would show love for each other. Chris has now been let go from Silverleaf as [a] therapist due to this situation after I reported it last week to the Executive Director who immediately took it to the Silverleaf board.

(Record (R.), at 4.) The family court issued a Temporary Interpersonal Protective Order (TIPO) after reviewing the Petition and eventually set the matter for a hearing on March 4, 2024.

At the hearing, Streble testified further about the allegations contained in her Petition. Early in the relationship, Streble expressed to Clan she was only comfortable with kissing, as she wanted to save sex until marriage in accordance with her religious beliefs (V.R., March 4, 2024, Hearing – 10:35:00.) After the May 18, 2023, incident, Streble claimed Clan admitted he had violated her boundaries, and said he would not do so again; however, she stated his actions became progressively worse and he continued to engage in unwanted sexual actions over the next three months. She said Clan would touch her in a way which caused her genitals to bleed, at least on one occasion, slap and hit her breasts, causing lingering pain, and had choked her on another occasion. (V.R., March 4, 2024, Hearing – 10:47:15.) On two other occasions, Streble claimed Clan had forced her to touch his own genitals, physically holding her hand on them until he

ejaculated.  (V.R., March 4, 2024, Hearing – 11:10:29.)  Streble testified that Clan, who was a youth pastor at the time, would persuade her that certain sexual acts were permitted under their religion, and that she believed the unwanted acts seemed to occur on days when she was tired from travelling with work.  (V.R., March 4, 2024, Hearing – 10:44:10.)  The last unwanted act occurred on August 2, 2023; Clan attempted to perform oral sex on Streble, would not stop when she asked him to, and only ceased his advances when Streble was forced to kick him away.  (V.R., March 4, 2024, Hearing – 10:50:33.)

Streble testified that she broke up with Clan soon thereafter.  Clan maintained contact with her friends and continued to contact her after she left employment at Silverleaf.  (V.R., March 4, 2024, Hearing – 10:54:40.)  Streble explained she felt the need to disclose Clan's actions to Silverleaf, as well as to the church where Clan was a youth pastor, because she thought it would make her feel safer and prevent Clan from engaging in similar acts against herself or anyone else.  Additionally, Streble testified that she felt intimidated outside of the courtroom when Clan went out of his way to walk in front of her and had parked next to her in the courthouse parking lot.  (V.R., March 4, 2024, Hearing – 10:55:30.)  The only witness called by Streble was Tremayne Williams, a mutual coworker and churchgoer.  Mr. Williams testified that Clan had told him that the parties broke up because Clan had violated Streble's boundaries by touching her genitals and

kissing her thigh area.  (V.R., March 4, 2024, Hearing – 11:13:30.)  Clan did not testify on the advice of counsel, and he did not call any witnesses at the hearing.

At the conclusion of the hearing, the family court stated it was entering an IPO for three years.  (V.R., March 4, 2024, Hearing – 11:28:30.)  In doing so, it found that an act of sexual assault occurred and may occur again.  It entered a standard Administrative Office of the Courts (AOC) Form 275.3 Order of Protection.  (R. at 21.)  Along with the AOC Form 275.3 order, the family court notated findings for the entry of an IPO on an accompanying docket sheet.  (R. at 20.)  This appeal followed.

## STANDARD OF REVIEW

This Court reviews the factual findings and entry of an order of protection under the clearly erroneous standard.  *See* Kentucky Rules of Civil Procedure (CR) 52.01; *Caudill v. Caudill*, 318 S.W.3d 112, 114 (Ky. App. 2010).  A judgment is not clearly erroneous if it is supported by substantial evidence, which is "evidence of substance and relevant consequence having the fitness to induce conviction in the mind[]" of a reasonable person.  *Owens-Corning Fiberglas Corp. v. Golightly*, 976 S.W.2d 409, 414 (Ky. 1998) (citations omitted).  "[I]n reviewing the decision of a trial court the test is not whether we would have decided it differently, but whether the court's findings were clearly erroneous or

that it abused its discretion." *Gomez v. Gomez*, 254 S.W.3d 838, 842 (Ky. App. 2008) (citations omitted).

## ANALYSIS

Clan argues before this Court that the family court erred in its filling out of the AOC Form 275.3 order and that his actions did not rise to the level necessary for the entry of an order of protection.

We shall first address Clan's arguments as to how the family court erred in its completing the AOC Form 275.3 order. Specifically, Clan asserts the family court failed to make any written findings; erroneously entered a DVO instead of an IPO; and failed to acknowledge that a dating relationship had existed between the parties.

To begin, we hold the family court's written findings were sufficient. In cases involving an order of protection, it is well established that the language set out in AOC Form 275.3 order, along with some level of additional findings, is sufficient to satisfy the family court's duty to reduce its findings to writing. *Pettingill v. Pettingill*, 480 S.W.3d 920, 925 (Ky. 2015); *Smith v. McCoy*, 635 S.W.3d 811, 813-17 (Ky. 2021); *Johnston v. Johnston*, 639 S.W.3d 428, 431-32 (Ky. App. 2021); *see also Williford v. Williford*, 583 S.W.3d 424, 430 (Ky. App. 2019). Like the court in *Pettingill*, the family court in this case entered an AOC Form 275.3 order, marked boxes under the "Additional Findings" section, and

-6-

made other factual findings on a docket sheet which accompanied the order. (R. at 20-23.) Thus, the family court satisfied its duty to make written findings.

Next, Clan argues that the family court erroneously entered a DVO and not an IPO. Notably, the process of obtaining DVOs and IPOs are extremely similar. "[T]he statute governing how the IPO statutes should be interpreted almost perfectly tracks the language of the statute governing how the DVO statutes should be interpreted." *Smith v. Doe*, 627 S.W.3d 903, 908 (Ky. 2021); *see also Calhoun v. Wood*, 516 S.W.3d 357, 360 (Ky. App. 2017). The sole difference between the two modes of protection is that DVOs are entered to protect family members or members of an unmarried couple (who are currently or have previously cohabitated), while IPOs are entered to protect individuals beyond those contemplated by the DVO statutes, such as those who are in a dating relationship, but living apart, victims of stalking, or victims of sexual assault. Kentucky Revised Statutes (KRS) 403.725(1); KRS 456.030(1). The fact that the same forms, including AOC Form 275.3 order, are used for the administration of both DVOs and IPOs is a testament to these similarities. *See Taylor v. Fitzpatrick*, 659 S.W.3d 745, 748 (Ky. App. 2023).

In this case, Clan reasons that the family court essentially entered a DVO, because the family court did not check the appropriate box indicating the order was an IPO at the top of the AOC Form 275.3 order. However, it is clear

from the record that the family court entered an IPO as stated in its oral ruling during the March 4, 2024, hearing and as indicated on the accompanying docket sheet upon which it made additional findings. It did not check the box for the entry of a DVO and there is no other indication that the family court intended to enter a DVO rather than an IPO. While technically an error, the omission is harmless and does not rise to the level of reversible error; at most, it constitutes clerical mistake which the family court is at liberty to correct. *Benson v. Lively*, 544 S.W.3d 159, 164 (Ky. App. 2018); CR 60.01.

Clan's next argument in relation to his assertion the family court erred in filling out the AOC Form 275.3 order, is it erred in not acknowledging a dating relationship existed between the parties. As seen on the AOC Form 275.3 order, instead of checking the box indicating "currently or previously in a dating relationship" the family court checked the boxes that indicated "none of the above relationships apply, but Respondent is alleged to have committed sexual assault." (R. at 21.) Notably, the family court found the parties were dating on the docket sheet accompanying the AOC Form 275.3 order. (R. at 20.)

Ultimately, whether the family court checked the boxes that the parties were in a dating relationship – and, as a result, made a finding that dating violence and abuse occurred – is inconsequential, because it found that sexual assault and sexual abuse occurred. As mentioned above, individuals who are

-8-

victims of sexual assault may file for an IPO, even if they are not in a dating relationship with their alleged abuser.  KRS 456.030.  In the context of IPO proceedings, "'[s]exual assault' refers to conduct prohibited as any degree of rape, sodomy, or sexual abuse under KRS Chapter 510 or a criminal attempt, conspiracy, facilitation, or solicitation to commit any degree of rape, sodomy, or sexual abuse, or incest under KRS 530.020[.]"  KRS 456.010(7).  In determining whether sexual abuse occurred, family courts regularly refer to KRS 510.130.  *See, e.g.*, *Jones v. Jones*, 617 S.W.3d 418, 424-26 (Ky. App. 2021); *see also, e.g.*, *Castle v. Castle*, 567 S.W.3d 908, 920 (Ky. App. 2019).  Under KRS 510.130(1), "[a] person is guilty of sexual abuse in the third degree when he or she subjects another person to sexual contact without the latter's consent."[2]  Furthermore, the statutory definition of "[d]ating violence and abuse" constitutes "[p]hysical injury, serious physical injury, stalking, *sexual assault*, strangulation, or the infliction of fear of imminent

---

[2]     'Sexual contact' means the touching of a person's intimate parts or the touching of the clothing or other material intended to cover the immediate area of a person's intimate parts, if that touching can be construed by a reasonable person as being done:

> (a) For the purpose of sexual arousal or gratification of either party;
>
> (b) For a sexual purpose[.]

KRS 510.010(7).

physical injury, serious physical injury, *sexual abuse*, strangulation, or assault . . . ." KRS 456.010(2)(a) (emphasis added).

*Sub judice* the family court found sexual abuse existed under KRS 510.130, and therefore found an act of sexual assault occurred. Because it found sexual abuse existed, it could have also found that dating violence and abuse existed. While it would have been more appropriate for the family court to check the box indicating the parties were in a dating relationship, the error is harmless considering its finding of sexual abuse.

Turning to Clan's final argument concerning the sufficiency of the evidence itself, he argues that his actions do not amount to those warranting protection by the protective order statutes. Pursuant to KRS 456.060, following a hearing conducted under KRS 456.040, a family court may enter an order of protection if it finds by "a preponderance of the evidence that [1] dating violence and abuse, sexual assault, or stalking has occurred and [2] may again occur[.]" A preponderance of the evidence in a proceeding for a protective order exists when the alleged victim was more likely than not to have been a victim. *Dunn v. Thacker*, 546 S.W.3d 576, 580 (Ky. App. 2018) (citing *Baird v. Baird*, 234 S.W.3d 385, 387 (Ky. App. 2007)).

Clan asserts his actions were merely foreplay and he always stopped when Streble asked him to stop. He argues Streble could not have been afraid of

him because she continually drove back to his apartment and allowed the allegedly unwanted acts to occur. He notes Streble also admitted to taking off her clothes on August 2, 2023. (V.R., March 4, 2024, Hearing – 10:59:15.) Though he did not testify at the hearing, Clan suggests in his brief that Streble may simply be a scorned lover who has disclosed his actions in an unfavorable light to his employers as a means to hurt him. However, Clan provided no evidence that the alleged events did not occur, nor any evidence to rebut Streble's testimony besides what was elicited from Streble and Mr. Williams on cross-examination. On the other hand, Streble testified at length about how Clan consistently violated her sexual boundaries; how he promised he would not do so in the future; how he used his position as a youth pastor to persuade her to engage in certain sexual acts; how he would not immediately stop unwanted sexual acts whenever Streble asked him to; and how she only removed her clothes on the aforementioned occasion because she felt threatened. From our review of the record, the family court thoroughly considered the entirety of the testimony and evidence presented, found Streble's testimony to be credible, and chose to believe her. *See Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). And, as required by CR 52.01, deference must be given to the family court to judge the credibility of the witnesses. Therefore, we conclude Clan's actions rose to the level of sexual abuse, and the family court did not err when it found an act of sexual assault occurred.

-11-

To determine whether dating violence and abuse, sexual assault, or stalking may again occur, requires the family court consider "the totality of the circumstances and weigh the risk of future violence against issuing a protective order." *See Pettingill*, 480 S.W.3d at 925. The mere lack of contact between parties is not determinative for a trial court's finding that sexual assault may again occur without issuance of the IPO, as required by KRS 456.060(1). *See Jones*, 617 S.W.3d at 427. In this case, the parties previously worked at the same location, went to church together, and have mutual friends; Clan continued to contact Streble after the two had broken up and she had left employment at Silverleaf; and Streble testified that Clan engaged in behavior that intimidated her. Given these circumstances, we cannot conclude the findings of the family court were clearly erroneous; therefore, we will not disturb those findings. *See Cherry v. Cherry*, 634 S.W.2d 423, 425 (Ky. 1982).

## CONCLUSION

For the forgoing reasons, we affirm the Hardin Family Court's IPO entered March 4, 2024.

ALL CONCUR.

| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEE: |
|---|---|
| Phyllis K. Lonneman | James D. Hafley |
| Elizabethtown, Kentucky | Radcliff, Kentucky |