RENDERED: AUGUST 24, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2016-SC-000427-DG

PHILLIP EDMONDSON        APPELLANT

|  | ON REVIEW FROM COURT OF APPEALS |
| --- | --- |
| V. | CASE NO. 2015-CA-001198-MR |
|  | UNION CIRCUIT COURT NO. 14-CR-00032 |

COMMONWEALTH OF KENTUCKY        APPELLEE

**OPINION OF THE COURT BY JUSTICE CUNNINGHAM**

**<u>REVERSING AND REMANDING</u>**

On the evening of January 11, 2014, eleven-year-old Jessica[1] went to the Sturgis Youth Center in Union County, Kentucky. Jessica was there with her mother, who was facilitating the Youth Center's concession stand. While Jessica and another child were playing air hockey, Appellant, Phillip Edmondson, offered a dollar to Jessica if she could score a goal. Jessica scored four separate goals during the game. Each time Appellant paid her the reward, he grabbed her buttocks. Later in the evening, Appellant grabbed Jessica's buttocks once more when saying goodbye. Unable to verbally communicate the prior events, Jessica created a written note on her cell phone

---

[1] A pseudonym is being used to protect the victim's anonymity.

describing Appellant's inappropriate touching. Jessica then showed the note to her friend while the two were still at the Youth Center. Jessica's friend told her mother about the note, who in turn told Jessica's mother. At that time, Jessica's mother contacted law enforcement. A video from the Youth Center was collected and, according to law enforcement,[2] corroborated Jessica's claims.

Appellant was subsequently indicted by a Union Circuit Court grand jury on a single count of first-degree sexual abuse. On June 22, 2015, Appellant was convicted of the crime charged. In conformity with the jury's recommendation, Appellant was sentenced to six years' imprisonment. Soon thereafter, Appellant filed a motion for a new trial pursuant to Kentucky Rule of Criminal Procedure ("RCr") 10.02, which the trial court denied. On July 22, 2016, the Court of Appeals affirmed the trial court's judgment and sentence. Appellant's appeal now reaches this Court by way of discretionary review.

This Court granted discretionary review in order to address Appellant's claim that he was denied a fair and impartial jury due to Mark Danhauer, the jury foreman, being the brother-in-law of an Assistant Commonwealth Attorney, Mike Williamson. Originally, Mr. Williamson was assigned the case. However, due to Mr. Williamson's previous representation of Appellant, another Commonwealth Attorney, J. Zachary Greenwell, prosecuted the case. Despite

---

[2] While the video was played for the jury numerous times during the trial, the video is not viewable from the trial record. Moreover, the video was not provided in the appellate record.

the conflict, Mr. Williamson assisted Mr. Greenwell during jury selection. Mr. Williamson had no further involvement in Appellant's prosecution. Subsequent to Appellant's conviction, but before his final sentencing, defense counsel discovered Mr. Danhauer's relationship to Mr. Williamson. Appellant's motion for a new trial quickly followed.

Our review of Appellant's claim requires a thorough recitation of the voir dire proceeding. As voir dire began, the trial court commenced with conducting preliminary examination of the venire panel. First, the trial judge prompted members of the venire panel to approach the bench if they believed they could not serve on the jury. At that time, numerous venire panelists who had a familial relationship with the parties approached the bench. Of the venire panelists who approached, all but one, were excused for cause including, but not limited to, ironically, *Appellant's* brother-in-law. Jessica's aunt, and a relative of one of Jessica's family members were also excused. The trial judge continued her examination by explaining to the venire panel that, "A few folks in that group were related or knew someone involved in the case." She then asked, "Is there anyone else in the audience that feels for some reason, some pressing reason . . . that has an issue with being here today?" Additional venire panel members approached the bench and explained knowledge of the situation. At no time did Mr. Danhauer approach the bench. The trial judge also introduced Mr. Greenwell and asked if anyone was related to him, to which Mr. Greenwell informed the court that his cousin was in the venire panel. Mr. Greenwell's cousin was then excused. Subsequently, Mr. Greenwell

3

informed the trial court that his friend from college, whom he dated twenty-five years prior, was also sitting on the panel. Again, neither Mr. Greenwell nor Mr. Williamson mentioned any relationship with Mr. Danhauer.

After these preliminary questions were asked, the trial judge introduced Mr. Williamson to the venire panel and asked the following question:

> Is anyone represented by Mr. Williamson, or have a relationship that we've not been made aware of that might impair their ability to be fair and impartial in this case? If you'll come forward please. If you feel that your relationship would prohibit you from being fair and impartial.

The taped recording of this portion of the record, which the Court has carefully reviewed, focuses solely on the bench. There is no indication that anyone, including Mr. Danhauer, had any reaction to this question. In fact, the trial judge went on to her next question instantaneously, without any pause or hesitation.

Later during voir dire, when Mr. Greenwell took over questioning, Mr. Williamson was once again introduced to the venire panel. Mr. Williamson's wife,[3] who was sitting next to Mr. Williamson at the attorney's table, was also introduced to the venire panel. Again, Mr. Danhauer's relationship to Mr. Williamson was not disclosed to the Court.

On July 13, 2015, the trial court conducted a hearing on Appellant's motion for a new trial, during which Mr. Danhauer testified. Mr. Danhauer

---

[3] Mr. Greenwell introduced Mr. Williamson's wife as "Linda Williamson". A Kentucky Bar Association search of "Linda Williamson" revealed no results. The Court is unaware of Mrs. Williamson's role in selecting the jury.

claimed that when the trial judge asked if anyone was related to Mr. Williamson, he raised his hand and stood up to make his way to the bench. However, before Mr. Danhauer reached the bench he returned to his seat because the trial judge qualified her question by stating that the relationship would need to impede the juror's ability to make an impartial and fair decision. Consequently, Mr. Danhauer did not believe he was obligated to inform the trial court about his familial relationship with Mr. Williamson because he assumed he could still be fair and impartial.

Defense counsel argued that he had no recollection of Mr. Danhauer making any affirmative acknowledgment following the trial judge's question. Defense counsel maintained that had he known about the relationship, he would have asked the trial court to remove Mr. Danhauer for cause, or at the very least placed the matter on the record. Defense counsel also provided the trial court with numerous cases where a new trial was granted when the juror falsely answered questions, or concealed information regarding a relationship with a party.

At the conclusion of the hearing, the trial court denied Appellant's motion. The trial judge admitted that she had not had an opportunity to review the record. Nonetheless, from her memory, she remembered Mr. Danhauer standing up to approach the bench following her question regarding Mr. Williamson. As the trial judge further explained, she recalled a number of people, including Mr. Danhauer, raising their hand when asked if they had a relationship with Mr. Williamson. Yet, defense counsel failed to follow-up with

5

any of these potential jurors. Ultimately, the trial court denied Appellant's motion since Mr. Danhauer had not given any false answers during his voir dire examination.

The Court of Appeals agreed with trial court and stated the following:

Danhauer tried to disclose his relationship with Williamson. Neither party explored his reason for initially raising his hand and beginning to approach the bench. Furthermore, Danhauer was not the only potential juror to acknowledge having a relationship with Williamson; *none* of those relationships was explored. The failure to do so rests squarely with the parties, not with the prospective juror and not with the trial court.

(Emphasis in original).

We begin our analysis by discussing the trial court and Court of Appeals' underlying and faulty conclusion that Mr. Danhauer—and other panelists— disclosed a relationship, or at the very least made affirmative acknowledgments of such.

As we have already stated, when the trial judge asked if anyone on the venire panel had a relationship with Mr. Williamson, the only individual visible on the recording is the trial judge. She presented her question continuously without any pauses or hesitations, indicating that the venire panel had no reactions. Indeed, the recording supports the conclusion that the venire panel remained silent. If Mr. Danhauer and other panelists made affirmative gestures, there is absolutely no indication of such on the record. Practically speaking, since it appears the qualifying sentence of the judge was stated within almost the same breath, it is unlikely Mr. Danhauer could have physically reacted that quickly—e.g., get up from his seat, start to move from

6

the box, retreat, and sit down. Furthermore, it stands to reason that the trial judge would have, at the very least, paused or questioned those prospective jurors further if such acknowledgements were made. She had done so with virtually every other juror who previously indicated a relationship with the parties.

Moreover, we find defense counsel's contention that he had no recollection of Mr. Danhauer making an affirmative gesture compelling. Defense counsel moved to strike numerous venire panelists who had relationships with the parties which were far less vulnerable to bias than Mr. Danhauer. Yet, during the several questions relating to relationships with the Commonwealth Attorneys, Mr. Danhauer was never identified or questioned. Thusly, the actions of the trial judge and defense counsel greatly undermine the conclusion that defense counsel was made aware that Mr. Danhauer had a relationship with Mr. Williamson.

We now turn to the merits of Appellant's claim. In reviewing the trial court's denial of Appellant's motion for a new trial, we look for an abuse of discretion. *See Anderson v. Commonwealth*, 63 S.W.3d 135, 141 (Ky. 2001). Accordingly, this Court must determine if the trial court's ruling was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). Since Appellant did not move to strike Mr. Danhauer for cause, his grounds for a new trial were made under a juror mendacity analysis. Under this standard, a new trial may be granted upon a showing "that a juror failed to answer honestly a material

7

question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause." *Adkins v. Commonwealth,* 96 S.W.3d 779, 796 (Ky. 2003) (quoting *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548 (1984)); *see also Anderson v. Commonwealth,* 864 S.W.2d 909, 911 (Ky. 1993) (reversing when juror "concealed vital information on voir dire, information which may have justified a challenge for cause in and of itself on grounds of implied bias."). This Court agrees with the trial court's conclusion that Appellant's claim fails under the first prong of the juror mendacity analysis. There has been no proof that Mr. Danhauer purposefully concealed his relationship with Mr. Williamson or that he failed to answer the voir dire questions honestly. As our thorough recitation of voir dire questioning demonstrates, Mr. Danhauer evidently believed his obligation to reveal his relationship to Mr. Williamson to the court was obviated by his personal belief that he could decide the case fairly. His belief is reasonable in light of the juror's inexperience and the questions posed by the trial judge.

Despite our finding that the juror mendacity analysis fails, we believe Appellant is entitled to relief pursuant to RCr 10.26. It is apparent to this Court that Appellant's fundamental right to a fair and impartial jury was violated. The right to a fair and impartial jury is guaranteed by Section Eleven of our Kentucky Constitution, as well as the Sixth and Fourteenth Amendments to the Constitution of the United States. *Ordway v. Commonwealth,* 391 S.W.3d 762, 780 (Ky. 2013) (citing *Fugett v.*

8

*Commonwealth,* 250 S.W.3d 604, 612 (Ky. 2008)). Providing a criminal defendant with a jury that is able to "render a fair and impartial verdict" is of utmost importance. *Id.* at 781. In order to protect this right, RCr 9.36(1) mandates that "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." In fact, this Court has instructed trial courts, as a "fundamental rule" of jury selection, to "err on the side of caution" by striking potential jurors who display uncertainty regarding impartiality. *Id.* at 780.

In regards to juror relationships with the parties, this Court has identified numerous relationships where bias may be implied despite the juror's ability to remain impartial. *Ward v. Commonwealth,* 695 S.W.2d 404, 407 (Ky. 1985) (quoting *Commonwealth v. Stamm,* 429 A.2d 4, 7 (1981)) ("[I]rrespective of the answers given on voir dire, the court should presume the likelihood of prejudice on the part of the prospective juror [when] the potential juror has such a close relationship, be it familial, financial or situational, with any of the parties, counsel, victims or witnesses."). This bias often stems "from the juror's having some personal reason, such as a relationship with a trial participant or personal experience of a crime like the one alleged, to lean one way or the other." *Futrell v. Commonwealth,* 471 S.W.3d 258, 272 (Ky. 2015) (citing *Gabbard v. Commonwealth,* 297 S.W.3d at 844 (Ky. 2009). When these close relationships are identified, the juror should be excused for cause since he or she is "so susceptible to the relationship as to be predisposed to be more

9

(or less) critical of one side's evidence than the other's." *Futrell,* 471 S.W.3d at 272.

Furthermore, this Court has long held that a potential juror's close relationship with the prosecutor is presumptively disqualifying. *See, e.g., Fugate v. Commonwealth,* 993 S.W.2d 931, 938 (Ky. 1999) (holding that "a trial court is required to disqualify for cause prospective jurors who had a prior professional relationship with a prosecuting attorney and who profess that they would seek such a relationship in the future."). In the case before us, we have an established relationship where bias must be presumed. *Ward,* 695 S.W.2d 404 (bias is presumed where juror is prosecutor's uncle). It is a very bothersome likelihood that Mr. Danhauer, either knowingly or subconsciously, gave more weight to the evidence presented by the Commonwealth. This is easily a situation wherein the familial relationship is "so apt to produce bias that even confident assurances to the contrary by the juror cannot erase significant doubts about his impartiality." *Futrell,* 471 S.W.3d at 274. Thusly, Mr. Danhauer was not qualified to sit on the jury panel and, had the relationship been exposed, he would have been removed for cause. Since Appellant never had the opportunity to challenge Mr. Danhauer's presence on the jury, he is entitled to a new trial.

The purpose of voir dire "is to determine whether a juror possesses necessary qualifications, whether he has prejudged the case, and whether his mind is free from prejudice or bias, so as to enable a party to ascertain whether cause for challenge exists and to ascertain whether it is expedient to exercise

10

the right of peremptory challenge." *Sizemore v. Commonwealth*, 306 S.W.2d 832, 834 (Ky. 1957). Our predecessor Court aptly explained this principle in *Drury v. Franke*, 57 S.W.2d 969, 984 (Ky. 1933), wherein a venireman remained silent when questioned about a relationship with a party. The Court stated the following:

> When the right of challenge is lost or impaired, the statutory conditions and terms for setting up an authorized jury are not met; the right to challenge a given number of jurors without showing cause is one of the most important rights to a litigant; any system for the empaneling of a jury that prevents or embarrasses the full, unrestricted exercise of the right of challenge must be condemned.

In the case before us, the actions of the trial judge, defense counsel, and the Commonwealth, all contributed to this constitutional error. As for the trial judge, a critical error occurred when she compounded her questions so as to only obtain affirmative answers if the juror believed he or she was unable to decide the case impartially. In doing so, Mr. Danhauer believed he was qualified to sit on the jury and not disclose the relationship. Yet, it is the trial court's evaluation, not Mr. Danhauer's, that determines if the proneness to bias impedes the ability to serve.

We also note that defense counsel had a responsibility to uncover the relationship through his own questioning. It is likely that the relationship would have been discovered through follow-up questioning had defense counsel realized that the trial judge's questions were inadequate and confusing to the jurors. However, it is Mr. Williamson's silence that troubles this Court the most. As an Assistant Commonwealth Attorney, Mr. Williamson should have been aware of the constitutional concerns that arise from having his brother-

11

in-law serve on the jury. Mr. Williamson witnessed Mr. Greenwell voluntarily disclose to the trial court the relationships he had with numerous jurors, including a cousin and a friend that he had not seen in over twenty-five years. Mr. Williamson witnessed these disclosures, yet declined to volunteer information concerning the relationship he had with Mr. Danhauer despite countless opportunities. Such a concealment is in direct odds with our principles of justice. As the Sixth Circuit cautioned, "there is a degree of candor necessary for effective disposition of cases in [the trial] [c]ourt[s] that counsel owes as an officer of the court. . . . failure in this regard suggests bad faith." *Cunningham v. Sears, Roebuck & Co.*, 854 F.2d 914, 916 (6th Cir 1988) (attorney failed to inform the court that his witness knew one of the jurors). In this situation, where reasonable steps to uncover juror relationships with the parties were unsuccessful, Mr. Williamson should have been forthcoming with the trial court that his brother-in-law sat in the venire panel.

We should also mention that this Court has seen no evidence that there was anything but a normal relationship between these two brothers-in-law. In other words, there was no estrangement or fissure in the relationship that would have minimized or diminished the closeness of such kinship.

For the above-stated reasons, we find that Appellant was denied his constitutional right to a fair and impartial jury. Such a denial seriously affected "the fairness, integrity, [and] public reputation of the proceeding." *McGuire v. Commonwealth*, 368 S.W.3d 100, 112 (Ky. 2012) (quoting *Martin v.*

12

*Commonwealth*, 207 S.W.3d 1, 3 (Ky.2006)). Consequently, Appellant is entitled to a new trial.

Having determined that reversible error occurred, we will now address those claims of error that may reoccur upon a new trial.

Appellant alleges that prosecutorial misconduct ensued twice during closing arguments. The first statement at issue occurred when the prosecutor analogized Jessica's actions after the abuse, including her failure to immediately come forward with the allegations, to that of victims of molestation by Catholic priests. More specifically, the prosecutor said, "Why didn't she jump up and down and scream at the top of her lungs immediately after these things happened? I wish I had an answer for these questions, but you know, with the priest case[s] in the Catholic Church, it took years for those kids to come forward, they still went to Mass every Sunday." Appellant objected to the Commonwealth's remark and requested an admonition, which was summarily denied.

As this Court has previously held, a prosecutor "may comment on evidence, and may comment as to the falsity of a defense position." *Slaughter v. Commonwealth*, 744 S.W.2d 407, 412 (Ky. 1987). The Commonwealth's short and isolated reference was made to rebut Appellant's inference that Jessica must have fabricated the allegations due to her subsequent behavior. We do not find reversible error, but caution both Appellant and the Commonwealth to avoid commenting on matters outside the record upon retrial.

13

Appellant's second complaint of prosecutorial misconduct occurred when the Commonwealth stated that surveillance video showed Jessica writing a message on her cell phone regarding Appellant's actions. Appellant claims that the Commonwealth's statement was unsupported by the record. We have reviewed the evidence and agree with the trial judge that the Commonwealth's remark was a reasonable inference based on totality of the evidence. *See Commonwealth v. Mitchell*, 165 S.W.3d 129, 131-32 (Ky. 2005). The Commonwealth's comment was within the bounds of proper closing arguments.

Lastly, as the issue will certainly resurface on retrial, we will address Appellant's argument that proof of sexual gratification is required to support a sexual abuse conviction. This issue was preserved by way of Appellant's motion for a directed verdict.

The Court will reverse a denial of a motion for a directed verdict "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt . . . ." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991) (citing *Commonwealth v. Sawhill*, 660 S.W.2d 3 (Ky. 1983)). Sexual abuse in the first degree is proscribed in Kentucky Revised Statute ("KRS") 510.110. The statute states, in pertinent part, that first-degree sexual abuse occurs when the defendant subjects a child, less than twelve years-old, to sexual contact. KRS 510.010 defines "sexual contact" as any touching of the sexual or other intimate parts of a person done for the purpose of gratifying the sexual desire of either party. Appellant posits that he was entitled to a directed verdict of

14

acquittal because there was no proof that he or Jessica derived sexual gratification from the act. Appellant's argument has no merit.

In *Anastasi v. Commonwealth,* 754 S.W.2d 860, 862 (Ky. 1988), it was held that "[i]ntent can be inferred from the actions of an accused and the surrounding circumstances." For that reason, "[t]he jury has wide latitude in inferring intent from the evidence. *Id.; see also, Tungate v. Commonwealth,* 901 S.W.2d 41, 42 (Ky. 1995). Jessica testified that Appellant showed unrelenting interest in her, commented on her femininity, and stared at her throughout the night in question. In addition, Jessica testified that Appellant grabbed her buttocks on numerous occasions. Thusly, it was not clearly unreasonable for the jury to find beyond a reasonable doubt that Appellant's touching of Jessica was done for the purpose of sexual gratification.

For the aforementioned, we hereby reverse the Union Circuit Court's judgment of conviction and sentence and remand this case for further proceedings consistent with this opinion.

All sitting. All concur.

15

COUNSEL FOR APPELLANT:

Dax Ryan Womack
WOMACK LAW OFFICE, LLC

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Leilani K.M. Martin
Assistant Attorney General