RENDERED:  JULY 14, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0244-ME

GUY JOSEPH TURCOTTE                                                APPELLANT

v.
APPEAL FROM BARREN CIRCUIT COURT
HONORABLE MICA WOOD PENCE, JUDGE
ACTION NO. 23-D-00022-001

B.E.D.                                                                          APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  EASTON, JONES, AND LAMBERT, JUDGES.

LAMBERT, JUDGE:  Guy Joseph Turcotte has appealed from the one-year

Interpersonal Protective Order (IPO) entered on February 17, 2023, by the Barren

Family Court on behalf of B.E.D.[1]  We affirm.

---

[1] Because this case involves an allegation of sexual assault, we shall use initials for the victim's name pursuant to Administrative Order 2006-10.

This matter began with the filing of a petition for an order of protection on January 30, 2023. In her petition, B.E.D. stated that on January 28, 2023, Turcotte sexually assaulted her, and she provided the following details:

> Mr. Turcotte came to my place of employment and asked about grooming. I took him to the groom shop to get prices and info to him. I mentioned his gun and asked if he was a cop, he said yes, a detective. We talked a bit about guns, how my employer doesn't allow us to carry so I carry pepper spray due to being so small, I'm easily kidnapped. He made a comment about me being cute and how he could see why someone would. He later called and made an apt. for me to groom his dog. When dropping off, he flirted and signed his dog in with, "♥ U G." This freaked me out some but I stayed professional, groomed his dog and let him know it was ready for pick up. At pick up, I went to fix his dog's bandana [when] he wrapped his arm around me, placed his hand firmly below my panty line and held me tightly against him and didn't let go when I tried to pull away.
>
> *Glasgow Police and State are investigating. Cap. Jones suggested I file this if I felt it was needed.

Based upon this set of facts, B.E.D. alleged that Turcotte had sexually assaulted her and therefore requested an IPO to restrain him from further acts or contact. She also sought to restrain him from being within a specified distance of her home and place of employment. The court issued a summons but did not issue an emergency protection order because the petition did not include an allegation of an ongoing risk of imminent harm.

The court held the IPO hearing on February 8, 2023. Turcotte, through counsel, disputed that B.E.D. had established that a sexual assault had occurred pursuant to the applicable statutes. B.E.D. appeared without counsel; she explained the chain of events leading to the filing of the petition, beginning with Turcotte coming to the dog grooming business where she worked to ask about the process and get pricing information. She admitted saying to him that she was "easily kidnapped" because she was small (she is less than five feet tall, and she carries pepper spray and multiple pocketknives because she is constantly worried about being kidnapped.) But that did not mean Turcotte could respond by saying that he could see why someone would want to kidnap her because she was "pretty cute." She tried to brush off his response, thinking that he did not know how oddly it had come across to her. Turcotte called for an appointment and brought his dog in two days later for B.E.D. to groom. He signed the documents with "♥ U G" when he dropped the dog off, which she also thought was strange. When he returned, he put his arm around her and placed his hand over her clothes in the area of her underwear line, which she was not okay with, in front of two co-workers. She did not know what to do and froze while he held her in a side hug against him with his hand in the same place for five to seven seconds. When he let go of her, she went back to where she had been and "shut down."

B.E.D. reported the incident and since then had been trying to go about her life without worrying that he was going to show up. Because Turcotte was a police officer, she knew he could easily access any information. Her two co-workers had given statements to law enforcement, although they could not be in court for the hearing due to personal and scheduling issues. She was disturbed by the hugging incident because she did not know him. She did not think it was appropriate for him to come into her place of employment and then flirt with her and sign the document with "♥ U G."

Turcotte called Randi Davidson to testify. She works at a local drug store in the pharmacy, and she knew Turcotte as a customer, not personally. She testified that he signed the receipts there with "♥ U" or "♥ U G" instead of a signature. Turcotte had put his arm around her before, and she was not offended by that. She had seen him interact with others in the store. He was very talkative and charismatic, and she had seen him put his arm around others frequently. He had made positive comments to her, but she did not construe that as flirting. He would comment on the appearance of other women who worked in the store, such as about their hair or makeup.

Turcotte testified next. He is a detective with the Glasgow Police Department, and is 6' tall. He did not know B.E.D. outside of the pet grooming shop. He provided his version of the events. On January 25, he went to the

groomer to get a sense of how much it would cost to have his dog groomed.

B.E.D. and another employee greeted him when he walked inside. He asked about

pricing, and B.E.D took him to the grooming area to get information about pricing.

As they were walking, B.E.D. was looking at his coat line where he carried his

handgun. She asked him if he was a cop, and he told her he was a detective. He

said that people sometimes told him he either looked like he was a cop or was in

the mob because he was Italian. She told him that she had a handgun that she

could not carry at work, so she carried mace, knives, and tasers. Because she could

not carry her handgun at work, she told him she was concerned about being

kidnapped because she was so small. He commented, "I can see why a cute little

thing like you would want to carry a handgun for protection." Then they began

discussing the costs of dog grooming and his dog's skin problems. He called to

make an appointment a couple of days later.

Turcotte took his dog to be groomed on Saturday the 28th, and he left

his dog with B.E.D. and another employee. When he returned, he looked through a

glass window and saw his dog on a table while B.E.D. was grooming on him. He

took a photo through the glass of his dog while she worked. He said he did not

want his dog to freak out when he saw him through the glass, so he took a photo to

send to his wife so she could see how good he looked. When he was inside the

room, Turcotte asked if he could take a photo of the dog's bandana to send to his

wife. Turcotte said B.E.D. did a great job grooming his dog and that he wanted to express his gratitude. As he thanked her for her work, B.E.D. came out from behind the counter. She stood by him and bent down to pet the dog. When she stood up, he put his arm around her, just under her armpit, and kept his hand there for the amount of time it took to say thank you. He said he thanked her a dozen times. Then he signed the digital screen on the counter with "♥ U G" before he left the room to pay. Turcotte testified that everyone was happy and that nothing was said to make him think anyone was uncomfortable. B.E.D. had never shown any type of concern, unease, or fear, and she was not upset when he took the photograph. At 8:00 that night, police officers came to his house saying B.E.D. reported that he had touched her inappropriately.

Turcotte said his normal digital signature is "♥ U" or "♥ U G" to protect his identity as it had been stolen in the past. He said he frequently puts his arms around women and men; this is his normal method of social interaction. He knew when people were uncomfortable because they put their hands up or shied away, or said, "please don't get in my space." And people had told him that they did not want to be hugged. But they had verbally told him they were uncomfortable; B.E.D. had not shown any indication that she was uncomfortable.

Turcotte attempted to introduce photographs of himself with his arm around other women to show where he normally placed his hand. He disagreed

with where B.E.D. said he placed his hand or that it was in an inappropriate location, and he said the hug was to show his gratitude only and lasted less than two seconds. The court did not permit the introduction of the photographs as they were not relevant to this specific incident; just because he acted appropriately in the tendered photographs did not mean he acted appropriately in this situation.

The court took the matter under submission as to whether a sexual assault had occurred, noting that it would take into consideration the legal arguments that Turcotte had submitted to the court that day.[2] Pending a ruling, the court ordered Turcotte not to have any contact or communication with B.E.D.

On February 17, 2023, the court entered a one-year IPO (not a three-year IPO as B.E.D. had requested), thereby finding that Turcotte had sexually assaulted B.E.D. and that it may occur again. The court included an attachment to the AOC Form 275.3 in which it set forth its legal reasoning supporting the entry of the IPO. This appeal now follows.

On appeal, Turcotte contends there was insufficient evidence to support the family court's findings that he had touched B.E.D. for sexual gratification or that such touching may happen again. He also seeks review of the family court's decision not to admit three photographs as evidence of habit pursuant to Kentucky Rules of Evidence (KRE) 406.

---

[2] Turcotte's legal memorandum is not included in the record on appeal.

Our standard of review is set forth in *Jones v. Jones*, 617 S.W.3d 418, 423 (Ky. App. 2021):

> A court may enter an IPO if it finds "by a preponderance of the evidence that dating violence and abuse, sexual assault, or stalking has occurred and may again occur[.]" [Kentucky Revised Statutes (KRS)] 456.060(1). The preponderance of the evidence standard is met when "sufficient evidence establishes the alleged victim was more likely than not to have been a victim" of dating violence and abuse, sexual assault, or stalking. *Dunn v. Thacker*, 546 S.W.3d 576, 580 (Ky. App. 2018) (citing *Baird v. Baird*, 234 S.W.3d 385, 387 (Ky. App. 2007)) (applying the preponderance of the evidence standard in the context of issuance of a domestic violence order ("DVO")).

> "A [family] court's findings of fact will only be disturbed if clearly erroneous." *Halloway v. Simmons*, 532 S.W.3d 158, 161 (Ky. App. 2017) (citations omitted). Factual determinations are not clearly erroneous if they are "supported by substantial evidence." *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003) (citation omitted). The test is not whether this Court would have decided a case differently but whether the family court's decision was "unreasonable, unfair, arbitrary or capricious." *Caudill v. Caudill*, 318 S.W.3d 112, 115 (Ky. App. 2010) (citation omitted).

> Furthermore, "[s]tatutory interpretation is a question of law and this Court reviews it *de novo*." *Artrip v. Noe*, 311 S.W.3d 229, 231 (Ky. 2010) (citation omitted).

In addition, the *Jones* Court instructed:

> The family court, not the appellate court, is the trier of fact and, as such, is responsible for judging the credibility of witnesses.

-8-

> Regardless of conflicting evidence, the weight of the evidence, or the fact that the reviewing court would have reached a contrary finding, due regard shall be given to the opportunity of the [family] court to judge the credibility of the witnesses because judging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the [family] court.

*Moore*, 110 S.W.3d at 354 (internal quotation marks and citations omitted).

*Jones*, 617 S.W.3d at 424-25.

First, we hold that the family court's findings of fact, which culminated in its determination that B.E.D.'s testimony was factual as opposed to Turcotte's testimony, are supported by substantial evidence of record. The court stated, in part, as follows:

> 8. Again, the Petitioner is 4'10" tall, and the Respondent is at least 6' tall. No matter which party's descriptions of the events is the truth, neither described hand placement by Respondent on the Petitioner seems to be a "natural" placement of Respondent's hand on the Petitioner as she was standing up. Even if the Respondent's description of these events leading up to the "hug" was accurate, it seems to this Court that Respondent would have more naturally and easily placed his hand on the Respondent's shoulder or back for this "side hug"; but under no circumstances would such a "hug" in any way result in Respondent's hand being placed on or near Petitioner's upper thigh/groin area.

> 9. The Respondent, upon cross-examination by the Petitioner, agreed that he at no point asked for

-9-

permission to touch her. He testified that he is just naturally a "touchy feely" person, and that people have asked him in the past not to touch them or not to hug them, but that Petitioner did not do either of those. It is clear Respondent presumes he can hug anyone, even if his familiarity with such person is based only upon a brief professional encounter, and the Respondent places the burden upon any recipient to stop him, as opposed to seeking permission, even if the subject recipient is a professional actively engaged in his/her course of employment.

10. The Court is more inclined to believe the Petitioner's version of events. Petitioner has no motivation to lie by accusing a local detective of sexual assault, especially considering the fact that doing such could create issues for herself within the community and possibly at her employment. The Petitioner's testimony was consistent, and she expressed genuine fear of the Respondent. It is clear that Petitioner's fear is heightened because, as a law enforcement officer, the Respondent holds a position of trust and power within the community, which also allows him to carry a firearm in areas where she herself is not allowed to do so, such as her place of employment. In the text that Petitioner sent to her manager [name deleted] later that evening on January 28th, entered as Defendant's Exhibit #1, the Petitioner expressed her fear that the Respondent would "retaliate or harass" her, and told [her] that she had been informed by police that the only "sure fire way" to prevent that was for [her manager] to ban the Respondent from the grooming shop. In the same text, the Petitioner said to [her] that the incident had caused her to be "a mess all day," and that Petitioner "hoped" [she] was not "angry" with her. Furthermore, even if the Respondent really is just as "touchy feely" as he describes, with no "sexual motivation," the Court is not convinced that he would even be able to recognize or accurately recount if he acted inappropriately towards Petitioner and/or violated her privacy. Accordingly, based on the totality

-10-

of circumstances, the Court ultimately believes the Petitioner's testimony to be factual.

Turning to the issues raised in the appeal, we shall first consider Turcotte's argument that the family court should have admitted the exhibit containing photographs of him with his arm around other women as evidence of his habit of doing so as a social greeting. KRE 406 provides, "[e]vidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." We review this ruling for abuse of discretion. *See Curry v. Bennett*, 301 S.W.3d 502, 505 (Ky. 2009).

The photographs, which were attached to the brief, are of Turcotte posing for a camera with his arm around different girls and women. Because these are posed photographs, they are not evidence of how he greets an individual socially, as Turcotte claims in his brief, and are irrelevant to determine how he was acting in the current situation. Therefore, we find no abuse of discretion in the court's decision to exclude the photographs tendered in Exhibit 6.

We shall now consider the merits of Turcotte's remaining arguments as to whether there was sufficient evidence that he touched B.E.D. for sexual gratification and that it may happen again. We have reviewed the attachment to the IPO setting forth the family court's analysis, and we conclude that the family

court properly interpreted the statute in deciding that B.E.D. was entitled to an IPO under the factual circumstances presented at the hearing and in her petition. Therefore, we shall adopt the following portions of the court's legal conclusions as our own:

2. The specific facts and circumstances present in this case seem to be a matter of first impression for Kentucky Courts proceeding under and/or interpreting KRS 456.060, and this Court has struggled with whether this case satisfies several of the requirements under KRS 456.060. This determination requires the Court to engage in distinct analyses of several different factors, some of which includes the application of multiple rules and/or interpretations, while also upholding the spirit and purpose of Kentucky's IPO statutes. Accordingly, in an effort to clarify this Court's analysis, the Court will organize its analysis as follows: this Court will first analyze whether Respondent committed or attempted to commit sexual assault upon Petitioner, meaning did Respondent touch or attempt to touch an "intimate part" of Petitioner's body, and was such touching or attempted touching done for the purpose of gratifying either party's sexual desire; if so, the Court will then analyze whether such sexual assault or attempted sexual assault may occur again.

### I. Sexual Assault

3. "Sexual assault," as the phrase is used in KRS 456.060, refers to, among other things, the commission, or *attempted* commission, of any conduct prohibited as any degree of sexual abuse under KRS Chapter 510. *See, e.g.*, *Rupard v. Wheeler*, No. 2022-CA-0500-ME, 2022 WL 17365888, at *2 (Ky. Ct. App. Dec. 2, 2022). As explained by the Kentucky Court of Appeals in *Jones v. Jones*, 617 S.W.3d at 425, KRS 510.130, which is also applicable in the present case, provides that a person is

-12-

guilty of sexual abuse in the third degree when he or she subjects another person, or attempts to subject another person, "to sexual conduct without the latter's consent." KRS 510.010(7) defines "sexual contact" as "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying the sexual desire of either party[.]"[3] The Respondent admitted that Petitioner did not consent to Respondent touching her in any way, so the Court must determine only whether there was "sexual contact" in order to satisfy KRS 510.130.

### a. Sexual Contact: "Intimate Part"

4. As established by the Supreme Court in *Bills v. Commonwealth*, 851 S.W.2d 466, 472 (Ky. 1993), in determining whether Petitioner's upper thigh/groin area is considered an "intimate part" of Petitioner's body, the Court must consider: (1) the area of the body where the touching occurred; (2) the manner of touching; and (3) the circumstances in which the touching occurred. Neither this Court nor the Respondent's counsel was able

---

[3] This section has been amended by the General Assembly, and, as of June 29, 2023, subsection (7) now provides:

"Sexual contact" means the touching of a person's intimate parts or the touching of the clothing or other material intended to cover the immediate area of a person's intimate parts, if that touching can be construed by a reasonable person as being done:

(a) For the purpose of sexual arousal or gratification of either party;

(b) For a sexual purpose; or

(c) In a sexual manner for the purpose of:

1. Exacting revenge or retribution;

2. Humiliating or degrading; or

3. Punishment;

-13-

to find a case involving an IPO in circumstances substantially similar to the ones at bar.

5. In *Rupard v. Wheeler*, 2022 WL 17365888, at *3, the Kentucky Court of Appeals affirmed the entry of an IPO based on an incident when the respondent showed up to the petitioner's house, uninvited, and expressed his interest in cheating on his wife with the petitioner right before "he 'forced [his hand] between [the petitioner's] legs[,]' rubbed his foot 'up and down [her] leg[,]' . . . 'push[ed] up against [her] breasts with his hand, intentionally[,]' and 'grabbed [her] hand and the back of [her] shirt to try to pull [her] down on the couch[,]'" all in the presence of the petitioner's child. *See also Bills*, 851 S.W.2d at 472 (explaining that, in most circumstances, the sexual organs would be considered an "intimate part," even if touched over the clothes of the victim, and that the leg would also be considered to be an "intimate part" of the body, assuming the other two factors are satisfied); *Johnson v. Commonwealth*, 864 S.W.2d 266, 277 (Ky. 1993) (finding that the "thighs" could be considered an "intimate part" of the body). The *Rupard* Court explained that it had no issue finding the presence of demonstrable danger because the defendant "engaged in the conduct underlying the IPO despite [the petitioner's] expressed and implied rejection of his advances and in the presence of a witness, [the petitioner's] daughter, which evinces a disregard for the consequences." 2022 WL 17365888, at *3.

6. Similarly, in *Jones v. Jones*, 617 S.W.3d at 426, the Court of Appeals affirmed entry of an IPO based on an incident when the respondent, who was the petitioner's former brother-in-law, sent several suggestive texts to the petitioner indicating that he wished to pursue a sexual relationship with her, even if it was against her will, then showed up at the petitioner's residence and "aggressively grabbed [her] in a 'bear hug,' pressing the front of his body against her back with his arms pressing against the undersides of her breasts."

-14-

The *Jones* court, without much discussion of the factors relevant to determining what constitutes an "intimate part," distinguished the facts present therein from those present in *Castle v. Castle*, 567 S.W.3d 908 (Ky. App. 2019). In *Castle*, the Kentucky Court of Appeals reversed a trial court's entry of an EPO [Emergency Protective Order], emphasizing the short time period between when the respondent began sending the suggestive texts and when the incident underlying the claim of sexual assault occurred. 617 S.W.3d at 426 ("[U]nlike the six-month lapse in *Castle*, the entire incident, including [the defendant's] earlier text messages, occurred over a period of less than twenty-four hours.").

7. The Court does not dispute that the manner of the Respondent's touching of the Petitioner's thigh/groin area here is different than the manner in which the victim was touched in *Rupard*, and unlike in *Jones*, Respondent herein did not make any outright statement that indicated he desired to engage in sexual intercourse with Petitioner, forced or otherwise. However, similar to the facts present in *Rupard*, the Respondent herein placed his hand on Petitioner's upper thigh/groin area and held his body against Petitioner's for approximately five (5) seconds in the presence of at least one other . . . employee, without Petitioner's permission, and in apparent disregard for the consequences. 2022 WL 17365888, at *3.

8. Furthermore, similar to some of the facts present in *Jones*, the Respondent here "hugged" the Petitioner by placing his hand on her upper thigh/groin area and held his body against her for approximately five (5) seconds during an undisputed embrace that the Responded described as a "side hug." This occurred just a couple of hours after he checked his dog in with the Petitioner and signed the receipt with a "♥ U G", and just two days after he: (1) stated to the Petitioner that she was cute; (2) indicated that he could understand why someone would want to kidnap or target her; and (3)

-15-

otherwise made facial expressions and/or employed body language that suggested to Petitioner that he was flirting with her. While these facts are certainly not as egregious or as overtly threatening as the facts present in *Jones*, mostly because the Respondent here did not make any overt statement indicating that he might rape the Petitioner and/or attempt to move the Petitioner to a more secluded location, we emphasize that the Respondent began flirting with the Petitioner mere minutes after the Respondent first met the Petitioner at her place of employment, and the claimed incident of sexual assault occurred only two (2) days after the Petitioner first met the Respondent, all while the Respondent was providing a professional service to the Respondent.

9. Accordingly, as the Respondent, who is a public employee whose duty it is to protect individuals such as the Petitioner, nonetheless had the audacity to so quickly escalate his advances towards Petitioner, in a professional setting at the Petitioner's public place of employment, we believe that the three . . . *Bills* factors discussed above support a finding that the Respondent touched an intimate part of the Petitioner's body without her consent.

### b. Sexual Contact: Done for the Purpose of Gratifying Sexual Desire

10. Having determined that the Respondent touched an "intimate part" of the Petitioner's body, the Court must now consider whether such touching was done for the purpose of "gratifying the sexual desire of either party[.]" *Jones*, 617 S.W.3d at 426.

11. In *Castle v. Castle*, 567 S.W.3d at 919, the Kentucky Court of Appeals found that the record did not support a finding of sexual abuse where a stepfather either "'grabbed' or 'barely brushed by'" his stepdaughter's breast because there was no evidence the act was for his sexual gratification. The Court of

Appeals distinguished the facts in *Edmonson v. Commonwealth*, 526 S.W.3d 78, 87 (Ky. 2017),[4] from those present in *Castle*:

> First, it was a criminal jury trial – not the grant of a DVO [Domestic Violence Order]. Second, the Supreme Court [in *Edmonson*] stated, "[i]ntent can be inferred[.]" We agree, but there must be proof from which to draw the inference. Third, all the alleged activity in *Edmondson* occurred on the same night, in the same location and with repetition. In this case, two events were separated by six months and only one had an alleged touching. In describing the night of the uncomfortable conversation which prompted [the] petition for a DVO six days later, O.H. said there was no touching and no attempted touching.

*Castle*, 567 S.W.3d at 918.

12. In the present case, this Court finds sufficient evidence to infer that Respondent touched an intimate part of the Petitioner's body for the purposes of sexual gratification. Similar to the challenged touching in *Edmonson*, the Respondent's touching of Petitioner occurred in the same location and shortly after Respondent engaged in two separate incidents of flirting with the Petitioner, during which the Respondent stated that he thought the Petitioner was "cute." Furthermore, unlike in *Castle*, the Respondent did not claim that he did not mean to touch the Petitioner, only that he touched her in a different spot than claimed by the Petitioner.

---

[4] "Inferring, in a criminal trial, a purpose of sexual gratification in a case where, at a youth center, the defendant offered a minor girl $1.00 for each goal she scored, and the child made four goals, after each of which the defendant paid her $1.00 and grabbed her buttocks, and then the defendant grabbed her buttocks a fifth time while saying goodbye at the end of the night." (footnote 13 in original).

## II. May Sexual Assault Occur Again

13.  Having found that sexual assault occurred, the Court must now consider whether it may occur again. This is the analysis with which the Court struggled the most, as the Petitioner pursuing this action will likely decrease the chances this would occur again. Kentucky case law concerning IPOs and this element in particular is, at best, scant, and the case law that is available does not provide a clear directive as to whether this element could be satisfied in circumstances such as those present in this case. However, this Court ultimately believes that the Respondent acted highly inappropriately during the January 28th incident, and that, if an IPO is not entered, it is more likely than not that the Respondent will engage in similar conduct again. The Respondent himself testified that he had people ask him not to touch them and has nonetheless continued to touch people without permission or even implied consent, even coming out of the COVID-19 era of physical distance.

14.  The Court also emphasizes the legislative purpose of the IPO statutes, as provided in KRS 456.020:

(1) This chapter shall be interpreted to:

(a) Allow victims to obtain effective, short-term protection against further wrongful conduct in order that their lives may be as secure and as uninterrupted as possible;

(b) Expand the ability of law enforcement officers to effectively respond to further wrongful conduct so as to prevent future incidents and to provide assistance to the victims;

> (c) Provide peace officers with the authority to immediately apprehend and charge for violation of an order of protection any person whom the officer has probable cause to believe has violated an order of protection and to provide courts with the authority to conduct contempt of court proceedings for these violations[.]

15. This Court believes that not entering an IPO in this case would not be serving the legislative purpose of KRS 456.060(1), as expressed in KRS 456.020. Entering an IPO against the Respondent here would allow the Petitioner to obtain "effective, short-term protection against further wrongful conduct" by the Respondent so that her life may be "as secure and as uninterrupted as possible." Denying Petitioner an IPO would mean that the Respondent, of whom Petitioner has demonstrated she has real fear, would be able to enter her place of employment at any time, and possibly sexually assault her again. Furthermore, Respondent's employment as a law enforcement officer means that he may have more access to information about the Petitioner, and additional ways of retaliation against her, available to him, with immediate protection against Respondent acting upon same without the protection of an IPO. The Court also notes that several of the legislative purposes expressed in KRS 456.020 intend to give law enforcement officers the ability to provide further protections to people such as the Petitioner, which is ironic considering one such officer is whom Petitioner is requesting protection from.

We find no error in the family court's conclusion that a sexual assault had occurred and may occur again, entitling B.E.D. to an IPO. We note that the

court opted to make the IPO effective for one year rather than the three-year period B.E.D. had requested, which was in Turcotte's favor. In addition, the statement in Turcotte's brief regarding B.E.D.'s state of mind in relation to her fear of being kidnapped is inappropriate and not well-taken.

For the foregoing reasons, the one-year IPO entered by the Barren Family Court is affirmed.

EASTON, JUDGE, CONCURS.

JONES, JUDGE, DISSENTS AND FILES SEPARATE OPINION.

JONES, JUDGE, DISSENTING: Respectfully, I dissent. I do not believe sufficient evidence existed upon which the trial court could conclude that the touching in this case was done for the purpose of sexual gratification. Having authored the dissenting opinion in *Castle v. Castle*, 567 S.W.3d 908 (Ky. App. 2019), which the trial court cited, I am well aware of the facts of that case and the authorities discussed therein.

In *Castle*, the lower court granted a DVO where the accused's stepdaughter testified that she was riding alone in a car with her stepfather at night when he began asking her questions about what kind of bra she was wearing and then reached over and "grabbed her boob." Several months later he tried to engage the teenage girl in a sexually charged conversation and indicated a desire to see and touch her breast. This Court reversed the trial court, concluding, in part, that

-20-

the trial court acted erroneously in granting the order of protection because there was no evidence that the touching was for sexual gratification.  Importantly, the majority reversed even though the trial court had accepted the girl's testimony that her stepfather grabbed her boob while riding in the car alone with her.   I dissented because I believed the evidence overall demonstrated that the stepfather had grabbed the teenager's breast for the purpose of sexual gratification and that the conduct was continued over a period of time, giving credence to her fear that it might repeat itself.

Like the trial court in *Castle*, the trial court here accepted the Appellee's version of events.  However, the facts in this case are even less suggestive of the Appellant having acted out of sexual gratification than they were in *Castle*.  The alleged victim in *Castle* was a minor, the parties were alone in a car at night, the stepfather asked an inappropriate question about the teenager's bra, and then the stepfather grabbed the girl's breast.  Here, the Appellee is an adult, the conduct took place in a public place in front of others, and the conversation was not on its face inappropriate.  Additionally, the stepfather in *Castle* engaged in subsequent conduct, attempting to have a very sexually charged conversation with the girl when the two were alone several months later, causing the girl to believe that he might attempt further sexual advances in the future.

Likewise, we recently held that the trial court did not err in granting an IPO where the accused "bear hugged" his sister-in-law pressing the front of his body against her back and placing his hands underneath her breasts. *Jones v. Jones*, 617 S.W.3d 418, 427 (Ky. App. 2021). The difference in *Jones*, however, is that the hugging was accompanied by outwardly sexual comments and an attempt to get the sister-in-law to go into a bedroom with him immediately after the hug. The Appellant here did not make outwardly sexual comments to the Appellee, and by all accounts he left the store after hugging her.

While I respect the great discretion afforded to the trial court in weighing the evidence, I find it impossible to reconcile the facts of this case with *Castle*, a published opinion that is binding on this Court. And while I dissented in *Castle*, the facts that compelled me to do so in that case are not present in this case. Even taking every word the Appellee testified to as true, I do not believe there was sufficient evidence to demonstrate that the Appellant's actions toward her were done for the purpose of sexual gratification. This is not to say that they were appropriate; however, not all unwanted touching rises to the level of touching undertaken to sexually gratify oneself or the other party. There is certainly a difference between socially unacceptable behavior and sexually unacceptable behavior. While this may have been the former, I do not believe the evidence

-22-

supported the trial court's conclusion that it was the latter.  For these reasons, I

would reverse.

BRIEFS FOR APPELLANT:

Benjamin D. Rogers
Glasgow, Kentucky

BRIEF FOR APPELLEE:

Sam Lowe
Bowling Green, Kentucky