RENDERED:  OCTOBER 6, 2023; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0267-ME

BRYAN SCOTT ALLEN                                                     APPELLANT

v.
APPEAL FROM KENTON FAMILY COURT
HONORABLE TERRI K. SCHOBORG, JUDGE
ACTION NO. 22-D-00534-001

VALERIE SUE EDER                                                       APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  COMBS, DIXON, AND ECKERLE, JUDGES.

COMBS, JUDGE:  Appellant, Bryan Scott Allen (Allen), appeals from an

interpersonal protection order (IPO) entered on behalf of Appellee, Valerie Sue

Eder (Eder), by the Kenton Family Court.  There was substantial evidence to

support the family court's finding that Allen stalked Eder, and after our review, we

conclude that there was substantial evidence to support a finding that his behavior amounted to an implicit threat. Therefore, we affirm the granting of the IPO.

On December 28, 2022, Eder filed a petition for an IPO against Allen. Based on the allegations in the petition, the family court granted a temporary IPO. Following a continuance, the family court conducted hearings on the petition on February 1 and February 9, 2023. The parties do not significantly disagree on the testimony presented at the hearings.

Eder and Allen were involved in a dating relationship from August 2021 until late July 2022. During this time, Allen was employed as the Chief of the Villa Hills Police Department. Following a vacation to Europe in July 2022, Eder informed Allen that she wanted to end the dating relationship. At Eder's request, they met twice to discuss her decision.

The first meeting took place on July 22 in the parking lot of St. Pius Church. While the meeting was generally amicable, it ended with Allen's telling Eder, "I will be highly offended if you change your passcode." Eder thought that this revelation was an odd thing for Allen to say. Consequently, she changed the passcode to her garage as well as the locks to her front and garage doors.

Their next meeting took place on August 21 at a Starbucks. The meeting had been arranged by a common friend, Lauren Anderson, who had

frequent contact with Allen at work. Eder again told Allen that the relationship had ended, and she told him that he should move on to someone or something else.

On September 26, Eder attended a soccer game in which her daughter was playing at Scott High School. Allen arrived alone and sat in the bleachers in a vantage point where he could watch Eder. However, Allen did not speak to Eder at that time. Allen left the game at the same time as Eder. He remained in the parking lot and attempted to text her. Eder did not respond to the messages. She testified that she did not recall Allen's ever attending any of her daughter's soccer games while they were dating.

In October, Allen sent flowers to Eder's home with a card that said,

> Val, I have missed you and will always. There has been a hole in my heart since we separated. I miss you and always will. I wanted to give these to you because I knew they made you smile, and I loved your smile. I will always love you. I wish you well in everything you do.

Eder blocked Allen's number from her phone after receiving the flowers.

On December 14, Eder received three text messages from an unknown number. The text sent to Eder's phone at 9:10 p.m. stated, "I saw you all sitting in the living room this evening looked nice [*sic*]. I see you seeing a Dave Gooch and he has spent a lot of nights there." Eder responded with "?." Almost immediately thereafter, Eder received another message from that same number saying, "Your house Dave spent the night last Friday." Then another message was sent saying,

"you were sitting on your couch tonight." Eder was concerned about the messages and suspected that Allen had sent them.

She contacted the Kentucky State Police about the contacts. Detective Joseph Filiatreau investigated the incident. During the investigation, Detective Filiatreau discovered that the unknown phone number was associated with Allen's daughter. Upon questioning by Detective Filiatreau, Allen admitted that he had used his daughter's phone to text Eder.

Allen also told Detective Filiatreau that he saw Eder and a man in a car pulling out of Eder's church. Allen wrote down the license plate number and asked another police officer to run the plate and identify the owner of the vehicle. That officer informed Allen that the vehicle was registered to David Gooch. Detective Filiatreau testified that he believed that Allen's actions were an improper use of his police authority and that they constituted the offense of second-degree official misconduct. Detective Filiatreau also testified that based on the content of the text messages, Eder could reasonably believe that Allen had been watching her on the night of December 14. However, he noted that Allen never made an implicit or explicit threat against Eder. Eder testified that after Detective Filiatreau informed her of Allen's actions, she became very concerned for her safety.

Following the second day of the hearing, the family court entered an IPO against Allen restraining him from any contact with Eder for a period of three

years. In its written findings of fact and conclusions of law entered on February 16, 2023, the family court found that Allen's actions met the definition of stalking under KRS[1] 508.130. The Court further concluded that his actions amounted to an explicit or implicit threat with the intent to place Eder in reasonable fear.

Allen now appeals from the IPO. Additional facts will be set forth below as necessary.

As an appellate court, we review a family court's issuance of an IPO to determine "whether the court's findings were clearly erroneous or . . . it abused its discretion." *Holt v. Holt*, 458 S.W.3d 806, 812 (Ky. App. 2015). In making this determination, we must be mindful of the family court's opportunity to assess the credibility of the witnesses. CR[2] 52.01. Abuse of discretion occurs when a trial court's decision is "unreasonable, unfair, arbitrary or capricious." *Sewell v. Sweet*, 637 S.W.3d 330, 334 (Ky. App. 2021) (quoting *Castle v. Castle*, 567 S.W.3d 908, 915 (Ky. App. 2019)). More specifically, a court abuses the discretion afforded it when "(1) its decision rests on an error of law . . . or a clearly erroneous factual finding, or (2) its decision . . . cannot be located within the range of permissible decisions." *Miller v. Eldridge*, 146 S.W.3d 909, 915 n.11 (Ky.

---

[1] Kentucky Revised Statutes.

[2] Kentucky Rules of Civil Procedure.

2004) (revised). *See also Buddenberg v. Buddenberg*, 304 S.W.3d 717, 720 (Ky. App. 2010).

An IPO allows a victim of dating violence and abuse, a victim of stalking or sexual assault (regardless of the presence of a past or current dating relationship), or an adult on behalf of a minor victim to petition for protection against a perpetrator. *Halloway v. Simmons*, 532 S.W.3d 158, 161 (Ky. App. 2017) (citing KRS 456.030(1)). If the trial court "finds by a preponderance of the evidence that dating violence and abuse, sexual assault, or stalking has occurred and **may again occur**, the court may issue an interpersonal protective order[.]" KRS 456.060(1) (emphasis added).

Under KRS 456.010(8), "'[s]talking' refers to conduct prohibited as stalking under KRS 508.140 or 508.150[.]" Stalking in the second degree, KRS 508.150(1), occurs when an individual intentionally:

    (a) Stalks another person; and

    (b) Makes an explicit or implicit threat with the intent to
        place that person in reasonable fear of:

        1. Sexual contact as defined in KRS 510.010;

        2. Physical injury; or

        3. Death.

KRS 508.130(1) defines stalking as meaning:

    (a) [T]o engage in an intentional course of conduct:

1. Directed at a specific person or persons;

2. Which seriously alarms, annoys, intimidates, or harasses the person or persons; and

3. Which serves no legitimate purpose.

(b) The course of conduct shall be that which would cause a reasonable person to suffer substantial mental distress.

"Course of conduct" means "a pattern of conduct composed of two (2) or more acts, evidencing a continuity of purpose." KRS 508.130(2).

To summarize, for an individual to be granted an IPO for stalking, he or she must at a minimum prove by a preponderance of the evidence that, an individual intentionally engaged in two or more acts directed at the victim that seriously alarmed, annoyed, intimidated, or harassed the victim, that served no legitimate purpose, and would have caused a reasonable person to suffer substantial mental distress, and that these acts may occur again. KRS 508.130 and KRS 456.060. Additionally, the individual must prove that there was an implicit or explicit threat by the perpetrator that put the victim in reasonable fear of sexual contact, physical injury, or death. KRS 508.150.

*Halloway*, 532 S.W.3d at 162.

In this case, Eder established that Allen's conduct amounted to stalking as defined in KRS 508.130. The initial two meetings, on July 22 and August 21, were clearly consensual. However, Eder unambiguously told Allen that their relationship was over and that she wanted no further contact with him. Nevertheless, Allen showed up at the soccer game on September 26 -- even though

-7-

he had never previously attended such games. Moreover, he positioned himself to watch Eder during the game. He also followed Eder to the parking lot and attempted to contact her when she left.

In October, Eder sent flowers and a note to Allen's house. In December, he followed a vehicle in which Eder was a passenger and used his connections as a police officer to obtain the driver's name and registration. And most significantly, on December 14, he anonymously texted Eder three times, indicating that he had been watching her house and knew with whom she was associating.

Allen contends that there was no evidence that this contact amounted to stalking because Eder was not aware of his involvement in the December 14 contacts until Detective Filiatreau so informed her sometime later. But his furtive texts were clearly intended to convey the message to Eder that she was being watched. The family court rejected Allen's explanations of this incident and the September and October contacts. The family court also noted that the December 14 texts strongly indicated that Allen had watched her house on more than one occasion. Finally, the family court was persuaded by Eder's testimony that she was concerned by these contacts. And even though Eder did not know with certainty that Allen was responsible for the December 14 incident, she suspected him strongly enough to contact the Kentucky State Police.

Contrary to Allen's argument, the statutory definition of stalking does not require that the victim be placed in immediate fear. Rather, the definition merely requires a showing that: (1) Allen intentionally engaged in two or more acts directed at Eder; (2) he seriously alarmed, annoyed, intimidated, or harassed her; (3) his behavior served no legitimate purpose; (4) the acts would have caused a reasonable person to suffer substantial, mental distress; and (5) that these actions may occur again. Although the evidence was conflicting, we conclude there was substantial evidence to support each of these elements.

The more difficult question is whether there was sufficient evidence to prove that Allen made an explicit or implicit threat to put Eder in reasonable fear of sexual contact, physical injury, or death as required by KRS 508.150(1)(b). The family court found that Allen's actions amounted to an implicit threat, stating:

> The act of communicating with Eder to inform her that he was actively watching her home and monitoring her activities and demonstrating he had the capability of using his authority as a police officer to obtain information as to her associations was an implicit threat that caused Eder to fear for her safety.

We agree with the family court's assessment.

As found by the family court, Allen's actions caused Eder significant alarm and annoyance. His actions could be reasonably construed as harassing and intimidating, and they are certainly troubling. Eder was justifiably afraid because she did not know what Allen might do next. Indeed, she noted that Allen

-9-

continued to engage in this conduct despite the risk to his own position as police chief. Eder did not identify any prior **words or conduct** by Allen that would indicate he may resort to violence. Nonetheless, Allen's stalking actions were deeply disturbing, and he clearly abused his authority as a police officer in order to further his personal interests.

Although it can be argued that this case presents a rather close call in the murky struggle to define *implicit*, the facts were ably and meticulously set forth by the trial court in its carefully crafted order. Its findings were clear, concrete, and specific. Again, as noted earlier, our task on review is governed by the standard set forth in *Holt*, 458 S.W.3d at 812; *i.e.*, we must determine "whether the court's findings were clearly erroneous or . . . it abused its discretion." There is no scintilla of error on either ground. The findings of fact were explicit and substantial, and the court acted correctly within its considerable range of discretion.

Therefore, the legal analysis as applied to those facts is our primary focus. There is no question that Allen's menacing and relentless pattern of conduct met -- and indeed exceeded -- the elements of the stalking statute, KRS 508.130. The only question is whether his behavior constituted an explicit or an implicit threat to Eder. The trial court found that the existence of an implicit threat was a reasonable conclusion under the circumstances as it stated at the beginning

of its order:  "the Court found that by the nature of the conduct there was an implicit threat of physical injury or sexual contact."

*Implicit* is defined[3] as "capable of being understood from something else though unexpressed . . . ; involved in the nature or essence of something though not revealed, expressed, or developed . . . ."  We cannot agree that it was unreasonable or arbitrary for the trial court to conclude that Eder had a legitimate basis to fear that she faced a realistic threat of the escalation of Allen's behavior into unwanted sexual contact from him.  As the trial court noted in its findings, they had been involved in an intimate dating relationship.  He was blatantly persistent in surveilling her house and her activities -- particularly with respect to her new companion.  As noted previously, he did not hesitate to abuse his position as a police officer in order to obtain intimidating information about her.  He did not have to brandish a weapon for her to conclude that he posed a clear and ongoing danger to her.  The statute wisely anticipates such nuances in conduct by defining the forbidden behavior to be either explicit or implicit.

In analyzing Allen's conduct and Eder's reaction to it, the trial court had the unique opportunity to assess their credibility.  In so doing, it concluded as follows:

> The act of communicating with Eder to inform her that
> he was actively watching her home and monitoring her

---

[3] *Implicit*, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (9th ed. 1985).

activities and demonstrating he had the capability of using his authority as a police officer to obtain information as to her associations was an implicit threat that caused Eder fear to her safety. A reasonable person would fear for their safety under the same circumstances.

The purpose of an IPO is to protect one who is already a victim from being victimized further as a result of conduct that already points to a dangerous propensity on the part of a perpetrator. Our appellate role does not permit us to substitute our judgment for that of the trial court -- especially in such a serious set of circumstances.

Therefore, we affirm the order of the Kenton Family Court entering an IPO.

DIXON, JUDGE, CONCURS.

ECKERLE, JUDGE, DISSENTS AND FILES SEPARATE OPINION.

ECKERLE, JUDGE, DISSENTING: Our General Assembly created interpersonal protective orders (IPOs) to protect victims of dating violence who would not otherwise be entitled to a traditional Domestic Violence Order (DVO). *See Halloway v. Simmons*, 532 S.W.3d 158, 161 (Ky. App. 2017) (citing KRS 456.030(1)). If the Trial Court "finds by a preponderance of the evidence that dating violence and abuse, sexual assault, or stalking has occurred and may again occur, the court may issue an interpersonal protective order[.]" KRS 456.060(1).

Under KRS 456.010(8), "'[s]talking' refers to conduct prohibited as stalking under KRS 508.140 or 508.150." Stalking in the second degree, KRS 508.150(1), requires that an individual intentionally,

(a) Stalks another person; and

(b) Makes an explicit or implicit threat with the intent to place that person in reasonable fear of:

1. Sexual contact as defined in KRS 510.010;

2. Physical injury; or

3. Death.

To grant an IPO, KRS 456.060(1) requires that the elements of stalking be proven by a preponderance of the evidence, rather than beyond reasonable doubt, as required for a criminal conviction. Nevertheless, when an IPO is granted based upon stalking, there must be substantial evidence supporting all of the elements under KRS 508.150(1). I fully agree with the majority that Allen's conduct in this case meets the definition of stalking set out in KRS 508.130(1).

The more difficult question is whether there was sufficient evidence to prove that Allen made an explicit or implicit threat to put Eder in reasonable fear of sexual contact, physical injury, or death, as required by KRS 508.150(1)(b). The Family Court found that Allen's actions amounted to an implicit threat, stating, "The act of communicating with Eder to inform her that he was actively

-13-

watching her home and monitoring her activities and demonstrating he had the capability of using his authority as a police officer to obtain information as to her associations was an implicit threat that caused Eder to fear for her safety." The majority agrees with this analysis. I respectfully, and very reluctantly, disagree.

There was no evidence in this case that Allen made an explicit threat against Eder. I also agree with the majority that the word, "implicit" is properly defined as "capable of being understood from something else though unexpressed . . . ; involved in the nature or essence of something though not revealed, expressed, or developed . . . ." However, KRS 508.150(1)(b) further requires that the implicit threat be made with the intent to place that person in reasonable fear of sexual contact, physical injury, or death.

In *Holloway*, *supra*, Holloway and Simmons were involved in a dating relationship that ended in 2015. After the relationship ended, Holloway alleged that Simmons repeatedly followed her to various public places with the intent to start arguments with her. In addition, Simmons repeatedly sent harassing and insulting text messages to Holloway and her friends. Based on this conduct, Holloway was granted a DVO against Simmons. After Simmons was charged with violation of the DVO, he sought an IPO against Holloway. Simmons alleged that Holloway was following him to various public places with the intent either to force him to leave or have him arrested for violation of the DVO. The trial court granted

-14-

an IPO directing Holloway to remain at least 300 feet away from Simmons at all times. *Holloway*, 532 S.W.3d at 160-61. On appeal, this Court reversed, concluding that Holloway's conduct could not be reasonably construed as an implicit threat of physical harm against Simmons. *Id.* at 163.

Other recent cases support this interpretation. In *Taylor v. Fitzpatrick*, 659 S.W.3d 745 (Ky. App. 2023), the family court renewed an IPO based on allegations that the respondent followed the petitioner to various public places "in order to intimidate me[.]" *Id.* at 749. This Court held that such conduct would not constitute an implicit threat of physical injury. *Id.* Similarly, in *Sewell v. Sweet*, 637 S.W.3d 330 (Ky. App. 2021), we held that the family court's finding that stalking had occurred and was likely to occur again was not supported by substantial evidence. *Id.* at 336. In that instance, the respondent followed the petitioner to her workplace and other public places with the intent of starting arguments, but there had been no threats, implicit or explicit, to support the victim being in fear of physical injury. *Id.* And in *Caudill v. Caudill*, 318 S.W.3d 112 (Ky. App. 2010), this Court considered the statutory definition of stalking under the DVO statute. We concluded that a visit by respondent to petitioner's workplace did not constitute domestic violence sufficient to satisfy the definitions of such contained within the statutes. *Id.* at 115.

-15-

I can find no meaningful distinction between Allen's conduct in this case and the conduct at issue in these other cases. I agree with the Family Court and the majority that Allen's actions caused Eder significant alarm and annoyance. His actions could be reasonably construed as harassing and intimidating, and they are certainly troubling. In no way can I endorse or justify his behavior. Eder was justifiably afraid because she did not know what Allen might do next. Indeed, she noted that Allen continued to engage in this conduct despite the risk to his own position as Police Chief.

However, Eder did not identify any prior words or conduct by Allen that would indicate he may resort to violence. Allen's stalking actions were deeply disturbing, and, clearly, he abused his authority as a police officer to further his personal interests. But at most, Allen's actions indicate a high degree of recklessness, as well as a willingness to continue this pattern of harassing and intimidating behavior against Eder. Allen's actions do not suggest that he may escalate to violence against Eder. Furthermore, we cannot infer such an intent from the fact that Allen was a police officer.

Allen's actions may warrant the entry of a restraining or no-contact order as part of any separate criminal charges. However, the current statutory language simply does not permit the granting of an IPO without at least an implicit threat of sexual contact, physical injury, or death. Evidence of such a threat just

does not exist under these facts.  Therefore, I must conclude that the Family Court clearly erred in finding that his actions amounted to an implicit threat of sexual contact, physical injury, or death.  Consequently, I would hold that the Family Court abused its discretion by granting the IPO and I would vacate the IPO entered in this case.


BRIEFS FOR APPELLANT:

Scott A. Crosbie
Dela C. Cummings
Lexington, Kentucky

BRIEF FOR APPELLEE:

Nicholas D. Summe
Covington, Kentucky